**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MEDLINE INDUSTRIES, LP, | **)** | |
| | **)** | |
| Plaintiff, | **)** | |
| | **)** | |
| v. | **)** | Case No. _____ |
| | **)** | |
| AL AUSIELLO, | **)** | |
| | **)** | |
| Defendant. | **)** | |

## <u>VERIFIED COMPLAINT</u>

Plaintiff, MEDLINE INDUSTRIES, LP ("MEDLINE"), by and through its attorneys, Levenfeld Pearlstein, LLC, hereby brings this action against Defendant, AL AUSIELLO ("AUSIELLO").

## <u>INTRODUCTION</u>

1.      This is an action by MEDLINE against its former Market Sales Director AUSIELLO.  In breach of his contractual obligations to MEDLINE, AUSIELLO has commenced employment with Performance Health, a direct competitor of MEDLINE in the supply of rehabilitation products.  In his new position, AUSIELLO cannot help but use his knowledge of MEDLINE's trade secrets and confidential and proprietary information for the benefit of his new employer.  Additionally, MEDLINE has discovered that before terminating his employment, AUSIELLO sent multiple Excel files to his personal email containing trade secrets and confidential and proprietary information, sometimes even renaming such files to avoid discovery.  One of the files contained 99,166 rows of data about MEDLINE's customers and sales, including information on gross sales pricing and net gross margin.  MEDLINE is bringing claims against AUSIELLO herein for violation of the Defend Trade Secrets Act, violation of the Computer Fraud & Abuse

Act, misappropriation of trade secrets in violation of the Illinois Trade Secrets Act and the New Hampshire Uniform Trade Secrets Act, breach of his contractual obligations, and violation of his duty of loyalty. MEDLINE and AUSIELLO have agreed to arbitrate disputes between them relating to AUSIELLO's employment, but AUSIELLO expressly agreed that MEDLINE would be permitted to seek preliminary injunctive relief pending resolution of its claims in arbitration. Accordingly, MEDLINE seeks the Court's assistance in maintaining the status quo through the entry of a temporary restraining order and a preliminary injunction pending arbitration.

## PARTIES

2.      MEDLINE is a provider of medical-surgical products and supply chain solutions. MEDLINE is an Illinois limited partnership and its principal place of business is in Northfield, Illinois.

3.      On information and belief, AUSIELLO is an individual domiciled in New Hampshire and residing at 14 Westminster Drive, Nashua, NH 03064.

## JURISDICTION AND VENUE

4.      The Court has jurisdiction over MEDLINE's claims pursuant to 28 U.S.C. § 1331, as this case involves, among other things, the application of two federal statutes, the Defend Trade Secrets Act, 18 U.S.C. § 1836(c), and the Computer Fraud and Abuse Act 18 U.S.C. § 1030(a)(2)(C).

5.      The Court also has jurisdiction over this action to the extent that MEDLINE's claims involve Illinois state law pursuant to 28 U.S.C. § 1332 as there is complete diversity between the parties and the amount in controversy exceeds $75,000. The court may also exercise supplemental jurisdiction over MEDLINE's state law claims pursuant to 28 U.S.C. § 1367; as such claims are so closely related to the Defend Trade Secrets Act or Computer Fraud and Abuse Act

claims that they are part of the same case and controversy.

6.      This Court may exercise personal jurisdiction over AUSIELLO  pursuant to the terms of that certain  Medline Industries, LP Confidentiality, Protective Covenants & Arbitration Agreement dated January 30, 2025 entered into between MEDLINE and AUSIELLO (the "Protective Agreement"), attached hereto as Exhibit A, in which AUSIELLO, at Section 18, agreed that any action brought by MEDLINE to enforce the restrictive covenants is subject to "the exclusive jurisdiction of the Circuit Court of Lake County, Illinois, and the United States District Court of the Northern District of Illinois."

7.      Based on AUSIELLO's conduct and employment with MEDLINE it was foreseeable that he would be required to appear and respond to MEDLINE's claims in the United State District Court for the Northern District of Illinois.

8.      Venue in this judicial district is proper by virtue of 28 U.S.C. § 1391(b)(2) because a substantial part of the events and/or omissions giving rise to the claims alleged herein occurred in this judicial district.

## FACTUAL ALLEGATIONS AS TO ALL COUNTS

### AUSIELLO's Employment with MEDLINE

9.      In August 2019, AUSIELLO was hired by MEDLINE in the position of Sales Specialist Equipment & Furnishings Division.  On August 1, 2022, AUSIELLO was promoted to Senior Sales Specialist.  On January 1, 2024, he moved into the position of Product Sales Specialist Advanced.  Finally, on January 1, 2025, his title changed to Market Sales Director.  At the time of his resignation, AUSIELLO was based out of his home in New Hampshire.

10.      Throughout his career with MEDLINE, AUSIELLO received the benefit of MEDLINE's training and development as well as of the goodwill MEDLINE has built up in the

marketplace and with customers through longstanding investment of its time and money on marketing, business development, and client service.

11.     As Market Sales Director, AUSIELLO was responsible for the sale of rehabilitation, safe patient handling, and fall prevention products to integrated delivery networks ("IDNs") across the United States, which are large organizations that operate networks of healthcare facilities.

12.     Rehabilitation products include all manner of supplies used in rehabilitation departments of acute care facilities, from less expensive items such as rubber exercise bands to higher-end products such as treadmills.  MEDLINE supplies both its own products to customers and products from other manufacturers in order to provide a total solution to a customer's needs.

13.     In his position as Market Sales Director, AUSIELLO had access to trade secrets and other highly confidential and proprietary information of MEDLINE.  The trade secrets to which AUSIELLO had access, include, but are not limited to, the following: MEDLINE's go-to-market strategy (including MEDLINE's target market, value proposition, pricing strategy, and marketing and sales strategies), customer identities and contact information (including information about the personnel with purchasing input and authority), customer needs and preferences, the identities and contact information of current prospects (including information about personnel at those prospects with purchasing input and authority), the content and status of proposals to prospects, information about pricing of products and margins on such pricing, and information about vendors and arrangements with such vendors (including pricing obtained by Medline).

14.     The sales cycle for IDNs can take years and involve multiple rounds of negotiation.  In some cases, the products being offered by MEDLINE will require internal hospital approval, which can extend the sales cycle.  In addition, MEDLINE seeks as part of the sales cycle

to help customers look for solutions and address clinical needs. If the customer eventually selects MEDLINE to be its principal supplier for rehabilitation, safe patient handling, and fall prevention products, this relationship typically will continue in place for an extended period over many years, as IDNs do not frequently switch their principal suppliers for a category of products.

### AUSIELLO's Most Recent Agreement with MEDLINE

15.     On January 30, 2025, AUSIELLO entered into the Protective Agreement with MEDLINE. The Protective Agreement superseded an agreement signed by AUSIELLO at the outset of his employment in 2019 that contained similar terms.

16.     AUSIELLO acknowledged that the restrictions to which he agreed in the Protective Agreement are necessary to protect MEDLINE's legitimate business interests, including MEDLINE's confidential and proprietary information and the goodwill which MEDLINE has built up through its investments of time and money in the marketplace and in customer relationships.

17.     In particular, in Section 4(a) of the Protective Agreement, AUSIELLO (referred to as "Salesperson" in the Protective Agreement) agreed as follows:

> Salesperson acknowledges that MEDLINE is engaged in a highly competitive business and that, by virtue of Salesperson's position, Salesperson engaging in or working for or with any business which is directly competitive with MEDLINE's Business would cause MEDLINE great and irreparable harm. Moreover, Salesperson acknowledges that MEDLINE, at great expense, has over several decades solicited and secured customers and potential customers through its sales and marketing efforts, and has created substantial goodwill with its customers, potential customers, suppliers, vendors, employees, and others throughout the United States and the world. Salesperson further acknowledges that MEDLINE has provided, and will continue to provide, Salesperson with the opportunity, at MEDLINE's expense, to benefit from the building and maintenance of that goodwill. Salesperson also acknowledges that, by virtue of employment, Salesperson has or will gain knowledge of MEDLINE's Confidential Information and the identity, characteristics, and preferences of MEDLINE's customers, suppliers, distributors, vendors, and other business partners, and that the Salesperson would inevitably have to draw on such Confidential Information if soliciting or servicing MEDLINE's customers, suppliers, distributors, vendors, and other business partners on behalf of a Conflicting Business.

5

(Exh. A, §4(a).)

18. AUSIELLO also agreed in the Protective Agreement that he would safeguard MEDLINE's Confidential Information. "Confidential Information" is defined in the Protective Agreement as "all information, or a compilation of information, in any form (tangible and intangible), related to MEDLINE's Business which (i) MEDLINE has not made public or authorized public disclosure of, (ii) is conspicuously marked or otherwise identified as confidential or proprietary, and/or (iii) should reasonably be understood by Salesperson to be confidential based upon the nature of the information. Confidential Information includes, but is not limited to: MEDLINE's business methods, know-how, ideas, research, techniques, theories, discoveries, technical data, formulas and processes for making any product or its components, plans, charts, designs, drawings; trade secrets; servicing information and service plans; the identities of MEDLINE's customers, prospective customers or suppliers, and referral sources (including the identities of contact persons within such customers and referral sources); preferences, likes, dislikes and technical and other requirements of customers, prospective customers and referral sources; business plans and proposals; current or prospective business opportunities; MEDLINE's strategies and forecasts; marketing plans, strategies and programs and reports and other information relating to MEDLINE's methods of doing business, including, without limitation, MEDLINE's costs, sources of supply, manufacturing, marketing, and selling techniques, computer programs, inventory methods, financing, business plans, contracts, equipment, billing procedures, financial records, product ideas, pricing and commission data, customer names and lists, customer requirements and purchases, customer needs and timing, and other customer data, created or obtained by Salesperson for the benefit of MEDLINE or any of its affiliates during the course of employment by MEDLINE." (Exh. A, §3(b).)

19.     With respect to Confidential Information, AUSIELLO agreed as follows in Section 5 of the Protective Agreement:

(a)     To not engage in any unauthorized use or disclosure of Confidential Information, and not to disseminate, lecture on, or publish Confidential Information without express written authorization from MEDLINE to do so.

(b)     To safeguard all Confidential Information and use all reasonable precautions to assure Confidential Information is protected and not exposed to, or taken by, any unauthorized person.

(c)     To use or disclose all Confidential Information only to the degree and extent required in connection with Salesperson's performance of services for or on behalf of MEDLINE.

(d)     To not, in any manner, either directly or indirectly, (i) disseminate, disclose, use, or communicate any Confidential Information to any person or entity, regardless of whether such Confidential Information is considered to be confidential by third parties, (ii) duplicate, remove, transfer, disclose, or utilize, nor knowingly allow any other person or entity to duplicate, remove, transfer, disclose, or utilize, any Confidential Information except as required within the scope of Salesperson's employment with MEDLINE, or (iii) otherwise directly or indirectly use any Confidential Information other than for the benefit of MEDLINE.

(e)     To comply with applicable cybersecurity and data privacy laws, policies, procedures and protocols in connection with the collection, use, storage, transmission, and encryption of Confidential Information.

20.     In addition, AUSIELLO agreed that "[w]hile employed with MEDLINE, Salesperson will devote Salesperson's full time and effort to the performance of Salesperson's duties and remain loyal to MEDLINE, and will not engage in any activities that create a conflict

of interest. Salesperson understands that it will be a conflict of interest for Salesperson to pursue business activities that compete with MEDLINE while employed with MEDLINE or engage in material preparations to do so. Salesperson will promptly inform MEDLINE of any business opportunities related to MEDLINE's Business, and will not pursue any such business opportunities independent from MEDLINE without advance written authorization from MEDLINE to do so. In addition, Salesperson shall not accept or engage in any activity, business, or employment, either during or after working hours, that would diminish the ability of Salesperson to render to MEDLINE the full, loyal, and undivided service which is contemplated in his or her employment by MEDLINE." (Exh. A, §7(a).)

21. Furthermore, AUSIELLO agreed that for eighteen (18) months following the end of his "employment with MEDLINE … [he] will not, alone or with others, as an employee, agent, officer, consultant, partner, director, owner, or otherwise, engage in any of the following acts without the express prior written consent of MEDLINE: (i) Participate in, manage, supervise, consult with, or provide services within the Restricted Area to a Conflicting Business that are the same as or similar in purpose of function to any services Salesperson provided to MEDLINE during the Look Back Period or that are otherwise likely to result in the use or disclosure of Confidential Information; (ii) Engage in the manufacture, development, design, or distribution (such as selling or marketing) of any Conflicting Product or Service within the Restricted Area; (iii) Own, operate, finance, control, or otherwise hold a material interest in a Conflicting Business … or (iv) Undertake any preparations or preliminary actions to engage in any of the activities prohibited under subsections (i) through (iii) above." (Exh. A, §7(b).)

22. A "Conflicting Business" is defined in the Protective Agreement as "any person, supplier, distributor, partnership, corporation, limited liability company, joint venture, sole

proprietorship, or entity which is engaged in or actively working to become engaged in a healthcare

supply or distribution business or other business which is or can reasonably be expected to compete

with the Business or otherwise involves a Conflicting Product or Service." (Exh. A, §3(d).)

23.     "Restricted Area" is defined in the Protective Agreement as "(i) Salesperson's

geographic territory or territories during the Look Back Period, if Salesperson has a geography-

based Territory; (ii) a radius of 100 miles surrounding the Salesperson's primary residence or any

of the location(s) of Salesperson's customers, if Salesperson has a customer-based Territory; or

(iii) a radius of 50 miles surrounding each office, facility, or location of MEDLINE that

Salesperson works out of or has supervisory or management authority over during the Look Back

Period, if neither (i) or (ii) applies." (Exh. A, §3(j).)

24.     Given that AUSIELLO worked with IDNs on a nationwide basis, the Restricted

Area for purposes of his Protective Agreement is the United States.

25.     "Conflicting Product or Service" is defined in the Protective Agreement as "any

product, process, technology, machine, invention or service of any person or entity, other than

MEDLINE, in existence or under development which resembles, competes with, or is intended to

resemble or compete with a product, process, technology, machine, invention, or service of

MEDLINE that Salesperson, or any employees under Salesperson's direct supervision, has

material involvement with or was provided Confidential Information about during the last two (2)

years of Salesperson's employment with MEDLINE. Due to Salesperson's position, Salesperson

shall be presumed to have had material involvement with or Confidential Information about all of

the products and services being sold or developed during the Look Back Period by the division(s),

subsidiary(ies), or unit(s) of MEDLINE that Salesperson was employed with or provided services

to during the Look Back Period." (Exh. A, §3(c).)

9

26.     For purposes of AUSIELLO's Protective Agreement, a Conflicting Product or Service would include the sale of rehabilitation products.

27.     Because of the importance to MEDLINE of the covenants in the Protective Agreement, AUSIELLO agreed that "if Salesperson breaches or threatens to breach the covenants and restrictions of this Agreement, MEDLINE will suffer irreparable harm and will be entitled to secure: specific performance of the Agreement, injunctive relief to avoid or prevent breaches, equitable tolling, and recovery of attorneys' fees and costs incurred in securing such relief; in addition to and not in lieu of damages and other remedies that would otherwise be available, in each only to the extent permitted by applicable law."  (Exh. A, §14.)

28.     In addition, although the parties to the Protective Agreement agreed that disputes between them generally would be subject to arbitration, they specified that "[n]othing … shall preclude MEDLINE or Salesperson from obtaining preliminary injunctive relief in any court of competent jurisdiction, to prevent irreparable harm pending arbitration on the merits of any actual or potential violations of this Agreement."  (Exh. A, §14.)

**MEDLINE's Efforts to Protect its Confidential and Proprietary Information**

29.     MEDLINE takes reasonable measures to protect its trade secrets and other confidential and proprietary information.

30.     For example, all employees of MEDLINE sign agreements containing covenants that prevent the unauthorized use or disclosure of trade secrets and other confidential and proprietary information.

31.     In addition, MEDLINE's computer networks may only be accessed by authorized employees who use unique user names and passwords.  Certain systems maintained to store information about pricing and customers may only be accessed by employees with a business need

10

to use such information.

32.     MEDLINE also provides periodic training to its employees on the appropriate procedures to follow in connection with the maintenance and use of trade secrets and other confidential and proprietary information.

33.     Finally, MEDLINE maintains employee policies and procedures that govern the use of all of MEDLINE's electronic systems and the use and disclosure of confidential information.

34.     An overview of the policies and procedures maintained by MEDLINE is contained in MEDLINE's "Medline Private Information Handling Guide," attached hereto as Exhibit B (referred to herein as the "Handling Guide").

35.     As stated in the Guide, "Medline Information represents a significant corporate asset. Mishandling Medline Information can lead to severe legal, financial, and reputational consequences for you and for Medline. Some Medline Information is confidential and must only be disclosed to those who have a legitimate business need for the information." (Exh. B, §1.3.)

36.     The Guide further specifies that "[a]ll information created, received, or used during business activities is considered Medline Information and is the property of the company. This includes, but is not limited to, all information in any tangible form, such as documents, emails, reports, and any other application in which information is communicated. Medline Personnel are the stewards of Medline Information and are expected to handle it in accordance with this guide and only for business purposes." (Exh. B, §1.4.)

37.     The Guide specifically states that confidential information includes "pricing and commercial terms with customers and suppliers; marketing or strategic plans; customer lists; employee records and legal documents." (Exh. B, §2.2.)

11

38.     Employees are instructed that in the handling of confidential information, "[c]are must be taken to ensure this information is protected and not disclosed to unauthorized persons," that such information may be stored "on Medline-owned, authorized or licensed Medline information technology," and that employees may not "forward or share confidential information with … [their] personal, non-Medline software accounts like Gmail or Dropbox accounts." (Exh. B, §§2.2, 3.1.1.)

39.     And employees are instructed in the Guide that they may only use MEDLINE "Information Technology Resources, including computers, phones, and tools such as email, chat, and other software, to further its business objectives," that [a]ccessing, using, or sharing Medline Information for any purpose other than Medline Business is prohibited, and that "[a]uthorized access may only be used to fulfill currently assigned job duties."  (Exh. B, §6.)

**AUSIELLO Leaves to Join Performance Health**

40.     Notwithstanding his contractual obligations under the Protective Agreement, AUSIELLO started employment with Performance Health on May 20, 2025.

41.     Performance Health Holdings, Inc. (with its subsidiaries and affiliates, referred to collectively herein as "Performance Health") is a supplier of rehabilitation products and is headquartered in Warrenville, Illinois.  Performance Health is MEDLINE's principal competitor in the supply of rehabilitation products.

42.     AUSIELLO's hiring by Performance Health was part of a coordinated raid of MEDLINE's employees in the rehabilitation products business area.  At or around the time that Performance Health hired AUSIELLO, Performance Health also hired AUSIELLO's manager at MEDLINE and another employee in the business area responsible for clinical marketing. MEDLINE is continuing to investigate the circumstances relating to the departure of the other

employees and the compliance of these employees with their contractual and other legal obligations.

43.     According to information in an email AUSIELLO sent MEDLINE's counsel, his position at Performance Health is in "national accounts working with GPOs and aggregate groups associated with GPOs." A "GPO" is a group purchasing organization that aggregates volume for leverage in negotiating pricing for many IDNs and other health care facilities.

44.     In the performance of his job duties in his new position, AUSIELLO cannot help but take advantage of MEDLINE's trade secrets and other confidential and proprietary information. His knowledge of MEDLINE's pricing and margins in the sale of rehabilitation products and its sales strategies inevitably will be used by him in setting and negotiating Preferred Health's pricing on such products with the GPO's and IDN's. This knowledge will allow him to undercut MEDLINE and to shut MEDLINE out of relationships with GPOs and IDN's.

45.     AUSIELLO's position with Performance Health is a direct violation of his Protective Agreement. He is both providing services in the Restricted Area that are "the same as or similar in purpose" to the services he provided to MEDLINE, and such services are otherwise likely to result in the use or disclosure of MEDLINE's Confidential Information. In addition, he is engaging in the distribution of Conflicting Products or Services within the Restricted Area.

### AUSIELLO Takes Confidential Information
### Prior to His Departure from MEDLINE

46.     In the lead up to his departure to Performance Health, AUSIELLO accessed MEDLINE's computer systems for an improper purpose and misappropriated MEDLINE's trade secrets and other confidential and proprietary information.

47.     Specifically, on at least five occasions he sent trade secrets and/or confidential and proprietary information to his personal email, either by directly sending such documents to his

13

personal email or by blind copying his personal email.

48.     AUSIELLO's personal email is "aausiell1@yahoo.com."

49.     The information AUSIELLO sent to himself consisted of various Excel spreadsheets, as explained in greater detail below, containing data apparently pulled from MEDLINE's Data Analytics Research Tool (referred to as "DART").  DART contains voluminous data on the customers serviced by MEDLINE and the products sold by MEDLINE to those customers, including the price to the customer, the cost to MEDLINE, MEDLINE's margin, and the quantity of the products sold.  DART is separately accessed via username and password and is only available to employees within MEDLINE who have a business-need to use such data.

50.     On April 22, 2025, AUSIELLO sent an Excel file labeled "Quote 9.xlsx" to his personal email.  The size of this file was 7.78 MB and it contained massive amounts of data, including 67,760 rows of data on MEDLINE's customers.  Each row referenced the names of an IDN, the names of the IDN Director, the GPO organization to which the IDNs belonged, and other information relating to the IDN.  Although much of this information might be publicly available in smaller segments, it constitute a protectible trade secret when compiled into a comprehensive database by MEDLINE.

51.     On April 25, 2025, AUSIELLO blind copied his personal email on an email he sent to other members of MEDLINE's sales team about an effort to win business from a new customer, Aspirus.  The email included an Excel file labeled "Aspirus - Performance Health PO Details 6 Months_Medline.xlsx."  One spreadsheet in this file showed the various products currently being purchased by Aspirus from Performance Health (as provided by Aspirus) and cross-matched them to products from MEDLINE.  The price MEDLINE proposed to offer the customer was included in the spreadsheet, and a final column in each row of data showed items

14

where MEDLINE needed to improve pricing.

52.     On April 28, 2025, AUSIELLO sent a PDF file labeled "Insurance 2025-1.pdf" and an Excel file labeled "Benefits.xlsx" to his personal email.  The PDF file attached to the email contained routine insurance information, exactly as its name suggested.  However, the Excel file attached to the email apparently had been renamed by AUSIELLO to avoid scrutiny if anyone reviewed the email.  In fact, it had nothing to do with "benefits" but instead contained two spreadsheets.  The first spreadsheet had 99,166 rows of data about IDNs, including information on gross sales pricing and net gross margin on products sold to the IDNs.  The second spreadsheet had 155 rows of similar data about Massachusetts General health system, which is an IDN that MEDLINE was pitching for increased business.  On April 29, 2025, AUSIELLO again sent a file labeled "Benefits.xlsx" to his personal email, which appears to be a smaller version of the original file but which still had 43,524 rows of data on the first spreadsheet.

53.     From the information in the "Benefits.xlsx" files, a competitor could determine what customers MEDLINE was servicing across the country, what rehabilitation products were being offered to those customers, what price was being charged, and what MEDLINE's margin was on the products.  They essentially would provide a road map to a competitor on how to win business away from MEDLINE.

54.     Finally, on May 1, 2025, AUSIELLO again blind copied his personal email on an email he sent to Aspirus containing updated pricing that MEDLINE was willing to provide to win the business away from Performance Health.  The email contained an Excel file labeled "4.9.25 Preformance [sic] Health to Medline – send to Al Ausiello.xlsx."  The Excel file had 117 rows of data, including a description of MEDLINE products that would be supplied and the purchase price of the products.

15

55.     AUSIELLO had no legitimate business purpose as part of his employment with MEDLINE to send the above-referenced documents to his personal email and was not authorized to do so.  And all of the above-referenced documents contained confidential information, were generated from confidential databases, or, in the case of the May 1, 2025 email, contained information that was intended only for use by a specific customer and that would be valuable if known to competitors.

56.     Trade secrets included in the files AUSIELLO sent to himself included pricing, margin, and customer information.  In addition, as mentioned above, even if some of the information contained in the files was in the public domain, it constituted trade secret information because it had been compiled at substantial time and expense in MEDLINE's proprietary databases and was not available in this manner and format to the public.

57.     Given that AUSIELLO sent the above-referenced files to himself in the period leading up to his resignation from MEDLINE, it is clear that his intent was to use the files on behalf of Performance Health after beginning his new employment.

**MEDLINE Loses Aspirus Opportunity**

58.     MEDLINE had been working since March of 2024 to win business away from Performance Health with a health system called Aspirus.

59.     If successful, this opportunity would have resulted in annual sales of at least several hundred thousand dollars.

60.     The salesperson primarily responsible for discussions with Aspirus relating to the pricing of rehabilitation products was AUSIELLO.

61.     In January 2025, after putting discussions with MEDLINE on hold for much of the prior year, Aspirus reported that they were unhappy with Performance Health and were willing

to consider switching to MEDLINE.

62.     In March 2025, AUSIELLO's manager reported that Aspirus was "committed to converting."

63.     On May 1, 2025, AUSIELLO provided final pricing to Aspirus and copied the email containing this pricing to his personal email address.  The conversion to MEDLINE and rollout was expected to follow in three phases.

64.     On May 5, 2025, AUSIELLO informed MEDLINE that he was resigning and going to Performance Health.  Shortly thereafter, during the week of May 12, 2025, Aspirus cut off discussions with MEDLINE, reporting only that Performance Health had given them better pricing.

65.     On information and belief and based on the timing of Aspirus' abrupt change in direction and the explanation provided to MEDLINE, AUSIELLO was either directly or indirectly responsible for Aspirus' decision to remain with Performance Health.

### Pre-Litigation Efforts by MEDLINE to
### Obtain Ausiello's Compliance with his Contractual Obligations

66.     On May 7, 2025, MEDLINE, through its attorneys, wrote to AUSIELLO and demanded that he honor his contractual obligations under the Protective Agreement.  MEDLINE also enclosed the Protective Agreement with its letter.  (*See* Exh. C.)  The next day on May 8, 2025, MEDLINE wrote to Performance Health to put them on notice of AUSIELLO's obligations and to ask them to ensure that such obligations were not violated by AUSIELLO.

67.     Despite telling MEDLINE's attorneys in an email on May 20, 2025, that he takes his obligations "very seriously," AUSIELLO nevertheless commenced employment on that date with Performance Health in violation of the Protective Agreement.

68.     For its part, Performance Health responded through its General Counsel on May

17

16, 2025 that it was "in the process of reviewing the matter and will respond in due course." Between May 16, 2025, and the May 27, 2025, MEDLINE exchanged a series of emails with both Performance Health and eventually its outside counsel and spoke by telephone with its outside counsel in an effort to obtain assurances that AUSIELLO would be complying with his obligations to MEDLINE under the Protective Agreement.

69.     To date, AUSIELLO has refused to abide by the terms of the Protective Agreement, and Performance Health has declined to take appropriate action to ensure such compliance.

70.     One of the principal arguments made by Performance Health is that it is permitted to hire AUSIELLO into his position because he had previously worked for Performance Health before joining MEDLINE.  However, the mere fact that AUSIELLO previously worked for Performance Health does not excuse his conduct in misappropriating MEDLINE's trade secrets and other confidential and proprietary information or permit him to violate restrictive covenants that were entered into as a condition of his employment with MEDLINE and that are necessary to protect MEDLINE's legitimate business interests.

71.     AUSIELLO also was asked in the letter on May 7, 2025 from MEDLINE's counsel to provide a certification under oath that he had not taken any MEDLINE proprietary and confidential information and that he had complied with his obligations under the Protective Agreement relating to Confidential Information.  After another request by MEDLINE, AUSIELLO signed and returned this certification to MEDLINE without disclosing that during his employment he had intentionally sent himself multiple electronic files belonging to MEDLINE containing trade secrets and other confidential and proprietary information, as described *supra*.

72.     AUSIELLO's decision to provide a certification to MEDLINE that he knew or

18

should have known was false demonstrates that MEDLINE cannot accept his assertions that he has not used or disclosed trade secrets and other confidential and proprietary information and that AUSIELLO cannot be trusted to safeguard MEDLINE's information in his new position with Performance Health.

## COUNT I
## Violation of the Defend Trade Secrets Act 18 U.S.C. § 1836

73.     MEDLINE restates and realleges Paragraphs 1–72 as if fully restated herein.

74.     The information described in in Paragraph 13 constitute trade secrets within the meaning of the Defend Trade Secrets Act, 18 U.S.C. § 1836 ("DTSA"), because its secrecy gives Medline an economic advantage over its competitors, it was imparted by Medline to AUSIELLO for the sole purpose of facilitating AUSIELLO's work for Medline, it is not generally available to the public, it was kept secure and strictly confidential, and it would not have been known to AUSIELLO but for his employment with MEDLINE.

75.     AUSIELLO had access to MEDLINE's trade secrets due to his job responsibilities and the necessity that he have access to such information to carry out his duties and obligations on behalf of MEDLINE.

76.     The trade secret information was created for the sole use and benefit of MEDLINE, all at significant expense, and is solely owned, developed, and controlled by MEDLINE.

77.     At all times relevant herein, MEDLINE took necessary and reasonable precautions to maintain the secrecy of its trade secret information, and AUSIELLO was never given permission by MEDLINE to remove, retain, disclose, copy, download, or misuse any of its trade secrets.

78.     AUSIELLO has already begun to work for Performance Health, which is a direct

19

competitor of MEDLINE, performing a substantially similar role as he did for MEDLINE.

79.     Based on AUSIELLO's misrepresentations regarding the information he misappropriated from MEDLINE, MEDLINE reasonably believes that AUSIELLO will exploit and/or misuse MEDLINE's trade secrets for his personal gain and for the gain of those acting in concert with him, including his new employer Performance Health.  Furthermore, on information and belief, MEDLINE fears that this improper misuse and exploitation may already have occurred.

80.     AUSIELLO would have never gained access to MEDLINE's trade secrets had AUSIELLO not been employed by MEDLINE.

81.     MEDLINE's trade secrets were misappropriated by AUSIELLO through willful, malicious and improper means for his benefit and for, on information and belief, those acting in concert with him.

82.     AUSIELLO's actions constitute a willful and malicious violation of the DTSA.

83.     AUSIELLO inevitably will profit and gain an economic advantage from his prior and continued use, disclosure, reliance upon and misappropriation of MEDLINE's trade secrets absent entry of the injunctive relief requested *infra*.

84.     The public policy in favor of the protection of MEDLINE's interest in maintaining its trade secrets greatly outweighs any possible interest AUSIELLO may claim in maintaining use and access to MEDLINE's trade secrets.

85.     As a result of the above, MEDLINE has no adequate remedy at law and has suffered and will continue to suffer an imminent risk of further irreparable harm.

86.     As a direct and proximate result of AUSIELLO's misappropriation of MEDLINE's trade secrets, MEDLINE has suffered and continues to suffer immediate and irreparable injury, loss, harm or damage, and will continue to suffer said injury, loss, harm, or

damage, unless and until AUSIELLO is enjoined and restrained.

87.     As a direct and proximate result of AUSIELLO's misappropriation of MEDLINE's trade secrets, MEDLINE has suffered and/or will suffer additional damages, which continue to accrue, including, without limitation, attorney's fees and costs.[1]

### COUNT II
### Violation of the Computer Fraud and Abuse Act 18 U.S.C. § 1030(a)(2)(C)

88.     MEDLINE restates and realleges Paragraphs 1-72 as if fully restated herein.

89.     AUSIELLO has violated the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a)(2)(C), by intentionally accessing at least one MEDLINE computer used in or affecting interstate commerce or communications, without authorization or by exceeding authorized access to such computer(s), and by obtaining information from the Company's protected computer(s).

90.     The computer files AUSIELLO accessed without authorization were maintained on MEDLINE's computers and computer system, which are "protected computers" within the meaning of 18 U.S.C. § 1030(e)(2), in that they were used by MEDLINE to engage in interstate and foreign commerce and communications, including e-mail communications with customers located in foreign states, and to otherwise conduct MEDLINE's business across state lines, via the Internet.

91.     AUSIELLO was not authorized to download or email his private email account any of MEDLINE's confidential, proprietary information or trade secrets. His accessing and transmission of those files was without authorization and contrary to the interests and policies of

---

[1] Here and elsewhere in the Verified Complaint, MEDLINE alleges damages in order to meet the elements of various claims for relief and show the harm or likely harm of AUSIELLO's actions. However, MEDLINE expects that such damages claims will be determined by arbitration between the parties pursuant to the terms of the Protective Agreement.

MEDLINE.

92.     AUSIELLO intentionally accessed at least one MEDLINE computer without authorization or exceeded his authorized access by emailing files containing MEDLINE's confidential, proprietary and trade secret information to his personal email account on the precipice of his departure from MEDLINE in order to surreptitiously steal MEDLINE's valuable business information and to engage in improper competition on behalf of his new employer Performance Health, in violation of the CFAA, 18 U.S.C. § 1030(a)(2)(C).

93.     AUSIELLO intentionally exceeded his authorized access to a protected computer without authorization, and as a result of such conduct, recklessly and/or intentionally caused damage and loss, in violation of the CFAA, 18 U.S.C. § 1030(a)(5)(C).

94.     As a result of AUSIELLO's misconduct and violations of the CFAA, MEDLINE has suffered "damage" and/or "loss," under the CFAA, in an amount exceeding $5,000, and is entitled to an award of damages for AUSIELLO's multiple breaches of the CFAA. The damage and loss suffered by MEDLINE includes the cost of reasonably investigating and otherwise responding to AUSIELLO's violations.

### COUNT III
**Violation of the Illinois Trade Secrets Act (765 ILCS 1065/1 *et seq.*) and the New Hampshire Uniform Trade Secrets Act (N.H. RSA §§ 350-B:1 to 350-B:9)**

95.     MEDLINE restates and realleges Paragraphs 1-72 as if fully restated herein.

96.     The information described in Paragraph 13 constitutes trade secrets within the meaning of the Illinois Trade Secrets Act ("ITSA") and the New Hampshire Uniform Trade Secrets Act ("NHUTSA") because its secrecy gives MEDLINE an economic advantage over competitors, it was imparted to AUSIELLO for the sole purpose of facilitating his work for MEDLINE, it is not generally available to the public, it was kept secure and strictly confidential,

and would not have been known to AUSIELLO but for his employment with MEDLINE.

97.     AUSIELLO had access to MEDLINE's trade secrets due to his job responsibilities and the necessity that he have access to such information to carry out his duties and obligations on behalf of MEDLINE.

98.     This trade secret information was created for the sole use and benefit of MEDLINE, at its significant expense, and was solely owned, developed, and controlled by MEDLINE.

99.     At all times relevant herein, MEDLINE took adequate and reasonable precautions to maintain the secrecy of its trade secret information. AUSIELLO was never given permission by MEDLINE to remove, retain, disclose, copy, download, or misuse any of its trade secrets.

100.    Immediately upon his resignation from MEDLINE, AUSIELLO began work for Performance Health, which is a direct competitor of MEDLINE, performing a substantially similar role as AUSIELLO did for MEDLINE.

101.    AUSIELLO has and will inevitably continue to disclose, rely upon, exploit, and/or misuse MEDLINE's trade secret information while acting in concert with others while employed by a direct competitor of MEDLINE.

102.    AUSIELLO would never have gained access to MEDLINE's trade secrets had he not been employed by MEDLINE.

103.    On information and belief, MEDLINE's trade secrets were acquired by AUSIELLO  through willful, malicious and improper means for both his benefit and that of those acting in concert with him.

104.    Performance Health and AUSIELLO inevitably will profit and gain an economic advantage from his prior and continued use, disclosure, reliance upon and misappropriation of

23

MEDLINE's trade secrets.

105.     The public policy in favor of the protection of MEDLINE's interest in maintaining its trade secrets greatly outweighs any possible interest AUSIELLO allegedly may have in using MEDLINE's trade secrets.

106.     As a result of the above, MEDLINE has no adequate remedy at law and has suffered and will continue to suffer an imminent risk of further irreparable harm.

107.     As a direct and proximate result of AUSIELLO's misappropriation of MEDLINE's trade secrets, MEDLINE has suffered and continues to suffer immediate and irreparable injury, loss, harm or damage, and will continue to suffer said injury, loss, harm, or damage, unless and until AUSIELLO is enjoined as requested *infra*.

108.     As a direct and proximate result of AUSIELLO's misappropriation of MEDLINE's trade secrets, MEDLINE has suffered and/or will suffer additional damages, which continue to accrue, including, without limitation, attorney's fees and costs related to this litigation.

## COUNT IV
## Breach of Contract

109.     MEDLINE restates and realleges Paragraphs 1–72 as if fully restated herein.

110.     The Protective Agreement, which was agreed to by AUSIELLO and executed by AUSELLIO, is an enforceable contract supported by consideration, including but not limited to continued employment with MEDLINE.   MEDLINE fully performed all obligations and conditions on its part under the Protective Agreement.   AUSIELLO has breached his Protective Agreement by engaging in the following conduct:

(a)     Improperly handling trade secrets and other confidential and proprietary information proprietary belonging to MEDLINE during his employment;

(b)     Improperly retaining MEDLINE's trade secrets and other confidential and

24

proprietary information following his resignation of employment with MEDLINE;

(c) Improperly using MEDLINE's trade secrets and other confidential and proprietary information for his benefit and the benefit of other acting in concert with him;

(d) Improperly commencing employment with a Conflicting Business in the Restricted Area and providing the same or similar services to the Conflicting Business as were provided to MEDLINE and/or services that are likely to result in the use or disclosure of MEDLINE's Confidential Information;

(e) Improperly engaging in the distribution of a Conflicting Product or Service in the Restricted Area on behalf of a Conflicting Business;

(f) Violation and breach of Section 5 of the Protective Agreement;

(g) Violation and breach of Sections 7(a) and (b) of the Protective Agreement; and

(h) Violation and breach of Section 11 of the Protective Agreement.

111. As a direct and proximate result of AUSIELLO's breach of the Protective Agreement, AUSIELLO has caused and will continue to cause MEDLINE to suffer irreparable injury if not immediately restrained.

112. MEDLINE is therefore entitled to an injunction prohibiting AUSIELLO's continued breach of the Protective Agreement; judgment against AUSIELLO for compensatory damages; interest; costs of suit; attorney's fees as agreed by AUSIELLO; and such other and further relief as the Court deems fair, just and equitable.

### COUNT V
### Breach of Duty of Loyalty

113. MEDLINE restates and realleges Paragraphs 1-72 as if fully restated herein.

114. As a Market Sales Director, AUSIELLO occupied a position of trust and confidence with MEDLINE and owed MEDLINE a fiduciary duty of loyalty at all times during

his employment in such position.

115.     As part of his duty of loyalty, AUSIELLO was required at all times to act solely for the benefit of MEDLINE, and never to MEDLINE's detriment.

116.     AUSIELLO violated this duty of loyalty when he chose to send files with trade secrets and confidential and proprietary business information to his personal emails.

117.     In addition, AUSIELLO violated his duty of loyalty by purposefully deceiving MEDLINE about his actions, including by renaming files so it would not appear to be suspicious that he was sending them to his personal email and by failing to disclose his actions to MEDLINE.

118.     Furthermore, AUSIELLO violated his duty of loyalty by not timely disclosing to MEDLINE that he had accepted employment with a competitor and that he therefore should not be working on matters involving taking business away from that competitor.

119.     Therefore, MEDLINE is entitled to compensatory damages relating to AUSIELLO's breach of his duty of loyalty and to disgorgement by AUSIELLO of amounts paid to him while he was engaging in such activity and such other and further relief as the Court deems fair, just and equitable.

WHEREFORE, MEDLINE INDUSTRIES, LP requests judgment in its favor and against Defendant AL AUSIELLO as follows:

A.     Enter a temporary restraining order, preliminary injunction and permanent injunctive relief:  (a) enjoining Defendant, and any person or entity acting in concert with Defendant, from violating Section 5 of the Protective Agreement; (b) enjoining Defendant, and person or entity acting in concert with Defendant, from violating Section 7 of the Protective Agreement by continuing to provide services to Performance Health involving the sale of rehabilitation products in the United States; and (c) directing Defendant to take such further actions as may be necessary to ensure that all of Plaintiff's trade secrets and other confidential and proprietary information is returned to Plaintiff, is not retained by Defendant, and is not used or disclosed by Defendant in the future;

B.     Award MEDLINE compensatory and punitive damages in excess of $75,000 and in an amount proven at trial;

C.      Award MEDLINE its attorneys' fees and associated litigation expenses against AUSIELLO; and

D.      Award MEDLINE such other and further relief that the Court deems just, equitable, and proper.

Dated:   June 2, 2025                                Respectfully submitted,

                                                     MEDLINE INDUSTRIES, LP

                                                     By:  s/ Peter F. Donati
                                                          One of Its Attorneys

Peter Donati
Christopher Heintskill
Jason Hirsh
LEVENFELD PEARLSTEIN, LLC
120 S. Riverside Plaza, Suite 1800
Chicago, Illinois 60606
Tel.:    (312) 346-8380
Fax:    (312) 346-8434
pdonati@lplegal.com
cheintskill@lplegal.com
jhirsh@lplegal.com

## **VERIFICATION**

The undersigned, Simon Larsen, hereby verifies that he holds the position of Vice President & Commercial Leader with Medline Industries, LP and as such is authorized to make this Verification on behalf of Plaintiff; that he has read the foregoing Verified Complaint and knows the contents thereof; and that the statements set forth in the Verified Complaint are true correct, except as to matters therein stated to be on information and belief, and as to such matters, the undersigned verifies that he verily believes the same to be true. This Verification is provided under penalty of perjury pursuant to 28 U.S.C. § 1746.

Date:    06-02-2025

# Exhibit A
# Protective Agreement

**MEDLINE INDUSTRIES, LP**
**CONFIDENTIALITY, PROTECTIVE COVENANTS & ARBITRATION AGREEMENT**

This CONFIDENTIALITY, PROTECTIVE COVENANTS & ARBITRATION AGREEMENT ("Agreement"), is effective as of 01/30/2025, by and between MEDLINE INDUSTRIES, LP, an Illinois Limited Partnership, its parent companies, subsidiaries, affiliates, divisions, directors, officers, successors and assigns, as well as any entities or assets acquired by and merged into Medline during the term of this Agreement ("Medline") and Ausiello, Al, an individual ("Salesperson").

1.  **Consideration**.  Salesperson promises and covenants in this Agreement, including but not limited to the post-employment obligations set forth in Sections 5, 7, 8, and 9, are made as a condition of Salesperson's employment. Salesperson acknowledges that such conditions are supported by substantial and adequate consideration, including but not limited to, significant compensation and benefits, eligibility for incentive programs, and access to Confidential Information; Medline customers, potential customers, and other parties upon whom Medline depends for its business dealings; business practices and strategies; product, service, and solution information; and training (through on the job experience and otherwise) on Medline's business methods, strategies, know how, intellectual property, and other means of success.

2.  **State-Specific Modifications**. If Salesperson resides in, worked in, or is otherwise subject to the laws of Alabama, Arizona, California, Colorado, Georgia, Illinois, Louisiana, Maine, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New York, North Carolina, North Dakota, Oklahoma, Oregon, Utah, Virginia, Washington D.C., Washington or Puerto Rico, Salesperson understands and agrees that certain provisions of this Agreement are modified as set forth on Appendix A.

3.  **Definitions**.

    (a)     Medline's "**Business**" means the development, manufacture and distribution of healthcare supplies, services, and solutions, on a nationwide and international basis, to acute care facilities, group purchasing organizations, long term care facilities, home health care agencies, physician offices, and other entities.

    (b)     "**Confidential Information**" means all information, or a compilation of information, in any form (tangible and intangible), related to Medline's Business which (i) Medline has not made public or authorized public disclosure of, (ii) is conspicuously marked or otherwise identified as confidential or proprietary, and/or (iii) should reasonably be understood by Salesperson to be confidential based upon the nature of the information. Confidential Information includes, but is not limited to: Medline's business methods, know-how, ideas, research, techniques, theories, discoveries, technical data, formulas and processes for making any product or its components, plans, charts, designs, drawings; trade secrets; servicing information and service plans; the identities of Medline's customers, prospective customers or suppliers, and referral sources (including the identities of contact persons within such customers and referral sources); preferences, likes, dislikes and technical and other requirements of customers, prospective customers and referral sources; business plans and proposals; current or prospective business opportunities; Medline's strategies and forecasts; marketing plans, strategies and programs and reports and other information relating to Medline's methods of doing business, including, without limitation, Medline's costs, sources of supply, manufacturing, marketing, and selling techniques, computer programs, inventory methods, financing, business plans, contracts, equipment, billing procedures, financial records, product ideas, pricing and commission data, customer names and lists, customer requirements and purchases, customer needs and timing, and other customer data, created or obtained by Salesperson

for the benefit of Medline or any of its affiliates during the course of employment by Medline. Confidential Information shall not be deemed to include information that: (i) was known to Salesperson on a non-confidential basis prior to employment by Medline; or (ii) Medline makes known, or authorizes to make known, to the general public; (iii) is in Salesperson's possession, without confidentiality restrictions, at the time of disclosure by Medline to Salesperson; (iv) was developed by Salesperson independent of any Confidential Information, as shown by written records prepared by Salesperson contemporaneously with such independent development; or (v) was received by Salesperson in good faith from a third party lawfully in possession thereof and having no obligation known by Salesperson to keep such information confidential. Medline's confidential exchange of information with a third party for business purposes will not remove it from protection under this Agreement. The presence of non-confidential items of information within an otherwise confidential compilation of information will not remove the compilation itself (the information in its compiled form) from the protection of this Agreement.

(c)        "**Conflicting Product or Service**" means any product, process, technology, machine, invention or service of any person or entity, other than Medline, in existence or under development which resembles, competes with, or is intended to resemble or compete with a product, process, technology, machine, invention, or service of Medline that Salesperson, or any employees under Salesperson's direct supervision, has material involvement with or was provided Confidential Information about during the last two (2) years of Salesperson's employment with Medline. Due to Salesperson's position, Salesperson shall be presumed to have had material involvement with or Confidential Information about all of the products and services being sold or developed during the Look Back Period by the division(s), subsidiary(ies), or unit(s) of Medline that Salesperson was employed with or provided services to during the Look Back Period.

(d)        "**Conflicting Business**" means any person, supplier, distributor, partnership, corporation, limited liability company, joint venture, sole proprietorship, or entity which is engaged in or actively working to become engaged in a healthcare supply or distribution business or other business which is or can reasonably be expected to compete with the Business or otherwise involves a Conflicting Product or Service.

(e)        "**Covered Customer**" is a person or entity that (i) Salesperson or a person acting under Salesperson's supervision had business-related contact or dealings with on behalf of Medline during the Look Back Period, (ii) about which Salesperson obtained Confidential Information during the Look Back Period, (iii) Salesperson knows or reasonably should know Medline has made sales and/or provided services to in the preceding year, and/or (iv) Salesperson knows or reasonably should know Medline has a pending proposal for sales or services as of the date Salesperson's employment with Medline ends.

(f)        "**Covered Employee**" means any individual who is a current employee of Medline that Salesperson worked with during the Look Back Period.

(g)        "**Covered Supplier**" is a supplier of Medline as to which the Salesperson or a person acting under Salesperson's supervision had significant business-related contact or dealings with on behalf of Medline during the Look Back Period.

(h)        "**Look Back Period**" means: (i) during employment – the one year period preceding the date at issue or such shorter length of time as Salesperson has been employed with Medline if Salesperson has been employed for less than one year as of such date; and, (ii) after employment ends – the two year

period preceding the last day of Salesperson's employment with Medline or such shorter period as Salesperson was employed with Medline if the Salesperson was employed for less than one year.

(i)      "**Proprietary Developments**" means inventions and discoveries (whether or not patentable), designs, works of authorship, mask works, improvements, data compilations, unique business methods or processes, and computer programs and software that are conceived or made by Salesperson alone or with others while employed by Medline and that relate to the research and development or the Business, or that result from work performed by Salesperson for Medline, or that are developed, in whole or in part, using Medline equipment, supplies, facilities, time, trade secrets, or Confidential Information.

(j)      "**Restricted Area**" means, as applicable, (i) Salesperson's geographic territory or territories during the Look Back Period, if Salesperson has a geography-based Territory; (ii) a radius of 100 miles surrounding the Salesperson's primary residence or any of the location(s) of Salesperson's customers, if Salesperson has a customer-based Territory; or (iii) a radius of 50 miles surrounding each office, facility, or location of Medline that Salesperson works out of or has supervisory or management authority over during the Look Back Period, if neither (i) or (ii) applies.

(k)      "**Solicit**" and related terms such as "soliciting" or engaging in "solicitation" mean to engage in contacts, acts, or communications, whether directly engaged in by Salesperson or indirectly engaged in through the use or control of others, that cause or induce, attempt to cause or induce, or can be reasonably expected to cause or induce a party to engage in a particular action or conduct, regardless of who first initiates the contact or communication, or whether or not the communication at issue is in response to a request for information or not.

(l)      "**Territory**" consists of accounts or geographic locations identified or assigned to Salesperson from time to time in writing by Medline.

4.      <u>**Purpose & Legitimate Business Interest**</u>.

(a)      Salesperson acknowledges that Medline is engaged in a highly competitive business and that, by virtue of Salesperson's position, Salesperson engaging in or working for or with any business which is directly competitive with Medline's Business would cause Medline great and irreparable harm. Moreover, Salesperson acknowledges that Medline, at great expense, has over several decades solicited and secured customers and potential customers through its sales and marketing efforts, and has created substantial goodwill with its customers, potential customers, suppliers, vendors, employees, and others throughout the United States and the world. Salesperson further acknowledges that Medline has provided, and will continue to provide, Salesperson with the opportunity, at Medline's expense, to benefit from the building and maintenance of that goodwill. Salesperson also acknowledges that, by virtue of employment, Salesperson has or will gain knowledge of Medline's Confidential Information and the identity, characteristics, and preferences of Medline's customers, suppliers, distributors, vendors, and other business partners, and that the Salesperson would inevitably have to draw on such Confidential Information if soliciting or servicing Medline's customers, suppliers, distributors, vendors, and other business partners on behalf of a Conflicting Business. Thus, Salesperson acknowledges that the restrictions contained herein, including at Sections 5, 7, 8, and 9, (i) are reasonable and necessary for the protection of Medline's Confidential Information and goodwill and that they are justified because Salesperson's expectation of loyalty, job duties, entrustment with Confidential Information (including trade secrets), training, and/or similar benefits of employment in a position of special trust and confidence gives Salesperson a unique and enhanced ability to compete unfairly and cause irreparable harm to Medline

absent these restrictions, (ii) will not interfere with Salesperson's future employment opportunities after the termination of Salesperson's employment with Medline, and (iii) are not intended to prohibit Salesperson from engaging in conduct that is authorized as part of Salesperson's job duties for Medline and undertaken for Medline's benefit.

(b)     Salesperson agrees to notify (i) Medline in writing if Salesperson accepts a position with a Conflicting Business and inform Medline of the identity of the prospective employer, the nature of Salesperson's expected duties with the prospective employer, the products and services provided by the prospective employer, and the geographic area in which Salesperson will be working as an employee of the prospective employer, and (ii) any prospective employer of the terms and conditions of Salesperson's post-employment obligations to Medline under this Agreement including under Sections 5, 7, 8, and 9 of this Agreement.

5.     **Confidential Information**.  Salesperson acknowledges that as an employee of Medline, Salesperson will receive Confidential Information that relates to Medline's Business, both pertaining to and beyond the Salesperson's particular areas of responsibility within Medline. Salesperson recognizes that (i) Medline has invested, and continues to invest, considerable amounts of time and money in obtaining and developing Confidential Information, as well as further developing Medline's goodwill of its customers; (ii) items of Confidential Information are Medline's valuable assets and have economic value, actual or potential, because they are not generally known by the public or others who could use them to their own economic benefit and/or to the competitive disadvantage of Medline, and thus, should be treated as Medline's trade secrets; and (iii) Medline has taken reasonable steps to keep that information confidential

(a)     Salesperson Obligations.  With respect to Confidential Information, Salesperson agrees:

(i)     That Salesperson's obligations concerning Confidential Information will continue after the end of Salesperson's employment for so long as the information remains qualified as Confidential Information. Salesperson acknowledges that an agreement not to disclose or use Medline's Confidential Information after Salesperson's employment ends would be inadequate, standing alone, to protect Medline's legitimate business interests because some activities would by their nature compromise the Confidential Information, goodwill, and other protectable interests of Medline.

(ii)     To not engage in any unauthorized use or disclosure of Confidential Information, and not to disseminate, lecture on, or publish Confidential Information without express written authorization from Medline to do so.

(iii)     To safeguard all Confidential Information and use all reasonable precautions to assure Confidential Information is protected and not exposed to, or taken by, any unauthorized person.

(iv)     To use or disclose all Confidential Information only to the degree and extent required in connection with Salesperson's performance of services for or on behalf of Medline.

(v)     To not, in any manner, either directly or indirectly, (1) disseminate, disclose, use, or communicate any Confidential Information to any person or entity, regardless of whether such Confidential Information is considered to be confidential by third parties, (2) duplicate, remove, transfer, disclose, or utilize, nor knowingly allow any other person or entity to duplicate, remove, transfer, disclose, or utilize, any Confidential Information except as required within the scope of

Salesperson's employment with Medline, or (3) otherwise directly or indirectly use any Confidential Information other than for the benefit of Medline.

(vi)        To comply with applicable cybersecurity and data privacy laws, policies, procedures and protocols in connection with the collection, use, storage, transmission, and encryption of Confidential Information.

(vii)        To comply with any other obligation herein with respect to Confidential Information, including but not limited to those set forth in Sections 7, 8, 9, 10, and 11.

(b)        Permitted Disclosure Pursuant to Applicable Law. Notwithstanding the foregoing, Salesperson acknowledges as follows:

(i)        Pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1833, Salesperson will not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is: (i) made in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law, or (ii) made in a complaint or other document filed in a lawsuit or other proceeding if such a filing is made under seal.  Any individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose a trade secret to the individual's attorney and use the trade secret information in the court proceeding so long as the individual: (i) files any document containing the trade secret under seal; and (ii) does not disclose the trade secret, except pursuant to court order.

(ii)        Nothing in this Agreement prevents or shall be construed to prohibit Salesperson from providing, without prior notice to Medline, information to governmental authorities regarding possible violation of law, testifying or participating in any investigation or proceeding by any governmental authorities regarding possible violation of law or otherwise disclosing information that is compelled by law.

(iii)        Nothing in this Agreement shall be construed to limit or impede an employee covered by the National Labor Relations Act (the "Act") from exercising rights protected under Section 7 of the Act by disclosing information concerning the wages, hours and terms and conditions of employment for employees covered by the Act.

(iv)        To the extent allowed by law, Salesperson will give Medline as much written notice as possible regarding any potential disclosure of Confidential Information and will cooperate with Medline in any legal action undertaken to protect the confidentiality of the information.

6.        <u>Third Party Confidential Information/ Disclosure of Other Agreements</u>.

(a)        Salesperson shall not, during employment with Medline, use or disclose any trade secrets or proprietary or confidential information of any former employer or other person or entity, and shall not bring onto the premises of Medline any unpublished documents or proprietary or confidential information belonging to any such employer, person, or entity unless consented to in writing by such employer, person, or entity.

(b)      This Agreement does not require Salesperson to violate, and Salesperson agrees to respect, any valid obligations which Salesperson has to prior employers or others relating to proprietary or confidential information, inventions and discoveries, and restrictive covenants.  Salesperson further agrees and represents that Salesperson's employment with Medline, and the duties that Salesperson will perform with Medline, will not be in breach of or violate any such obligations or agreements.  Salesperson agrees and represents that Salesperson's employment with and performance of duties for and/or on behalf of Medline will not be in breach of or violate any prior obligations or agreements.  Salesperson further represents that Salesperson is not subject to any covenant that restricts his or her ability to perform duties on behalf of Medline.

7.      **Noncompete Covenants**.

(a)      Loyalty During Employment.  While employed with Medline, Salesperson will devote Salesperson's full time and effort to the performance of Salesperson's duties and remain loyal to Medline, and will not engage in any activities that create a conflict of interest. Salesperson understands that it will be a conflict of interest for Salesperson to pursue business activities that compete with Medline while employed with Medline or engage in material preparations to do so. Salesperson will promptly inform Medline of any business opportunities related to Medline's Business, and will not pursue any such business opportunities independent from Medline without advance written authorization from Medline to do so. In addition, Salesperson shall not accept or engage in any activity, business, or employment, either during or after working hours, that would diminish the ability of Salesperson to render to Medline the full, loyal, and undivided service which is contemplated in his or her employment by Medline.

(b)      Post-Employment Restrictions.  For eighteen (18) months following the end of Salesperson's employment with Medline, regardless of which party terminates the employment relationship or why it is terminated, Salesperson will not, alone or with others, as an employee, agent, officer, consultant, partner, director, owner, or otherwise, engage in any of the following acts without the express prior written consent of Medline:

(i)       Participate in, manage, supervise, consult with, or provide services within the Restricted Area to a Conflicting Business that are the same as or similar in purpose of function to any services Salesperson provided to Medline during the Look Back Period or that are otherwise likely to result in the use or disclosure of Confidential Information;

(ii)      Engage in the manufacture, development, design, or distribution (such as selling or marketing) of any Conflicting Product or Service within the Restricted Area;

(iii)     Own, operate, finance, control, or otherwise hold a material interest in a Conflicting Business; provided, however, that nothing herein shall prohibit Salesperson from owning 5% or less of the publicly traded stock of a Conflicting Business so long as such ownership is a non-controlling interest, passive in nature (such as through a mutual fund), and Salesperson has no other material involvement with the Conflicting Business of any kind, within the Restricted Area; or

(iv)     Undertake any preparations or preliminary actions to engage in any of the activities prohibited under subsections (i) through (iii) above.

8.      **Nonsolicit Covenants**.

(a)        During employment and for eighteen (18) months following the end of Salesperson's employment with Medline, regardless of which party terminates the employment relationship or why it is terminated, Salesperson will not, alone or with others, as an employee, agent, officer, consultant, general or limited partner, principal, proprietor, joint venturer, shareholder, member, manager, investor, trustee, affiliate, director, owner, or otherwise, engage in any of the following acts without the express prior written consent of Medline:

        (i)        Solicit or attempt to Solicit a Covered Customer on behalf of a Conflicting Business or about any Conflicting Product or Service;

        (ii)        Knowingly induce or encourage a Covered Customer or Covered Supplier to cease doing business with Medline, change the terms of an existing business relationship with Medline to the detriment of Medline, or otherwise interfere with the relationships between any Covered Customer or Covered Supplier and Medline; or

        (iii)        Undertake any preparations or preliminary actions to engage in any of the activities prohibited under subsections (i) and (ii) above.

(b)        Salesperson acknowledges that these restrictions are reasonably limited in geography by their nature to those places or locations where the applicable Covered Customer and Covered Suppliers do business.

9.        **Nonrecruitment Covenants**.

(a)        During employment and for eighteen (18) months following the end of Salesperson's employment with Medline, regardless of which party terminates the employment relationship or why it is terminated, Salesperson will not, without the express prior written consent of Medline, in person or through the direction or control of others, on Salesperson's own behalf or on behalf of any person or entity that Salesperson is associated with:

        (i)        Hire, or assist in the hiring of, a Covered Employee;

        (ii)        Solicit or recruit a Covered Employee to leave employment or association with Medline, or to materially reduce to Medline's detriment any ongoing relationship that a Covered Employee has with Medline; or

        (iii)        Undertake any preparations or preliminary actions to engage in any of the activities prohibited under subsections (i) and (ii) above.

(b)        This Section 9 does not prohibit public general advertisements for job openings.

10.        **Works-for Hire/Ownership of Property**.

(a)        Salesperson agrees that all works of authorship or inventions developed, authored, written, created or contributed to, alone or with others, at any time within or outside normal working hours during the term of Salesperson's employment for the benefit of Medline, whether solely or jointly with others, shall be considered works-made-for-hire to the extent permitted by applicable law. Salesperson agrees that, to

the extent permitted by applicable law, such works shall be the sole and exclusive property of Medline and that all right, title and interest therein or thereto, including all intellectual property rights existing or obtained in connection therewith, shall likewise be the sole and exclusive property of Medline.

(b)        Salesperson agrees that, to the extent that any work is not considered to be work-made-for-hire by operation of law, Salesperson hereby assigns all of Salesperson's right, title and interest therein to Medline. At the request and expense of Medline, Salesperson agrees to perform in a timely manner such further acts as may be necessary or desirable to transfer, defend or perfect Medline's ownership of such work or inventions and all rights incident thereto.

(c)        Salesperson acknowledges that Salesperson is not required to assign to Medline any rights in any inventions or discoveries developed, made or conceived by Salesperson without the equipment, supplies, facility or Confidential Information of Medline and entirely on Salesperson's own time, unless: (i) the invention relates directly to the Business or to Medline's actual or demonstrably anticipated research or development; or (ii) the invention results from any work performed by Salesperson for Medline.

(d)        Salesperson acknowledges that Salesperson is not required to assign to Medline any inventions or discoveries, developed, made or conceived prior to Salesperson's employment with Medline, or information relating to such inventions or discoveries. Upon or prior to commencement of employment, Salesperson shall disclose to Medline all inventions and discoveries developed, made or conceived by Salesperson prior to Salesperson's employment with Medline which are owned by Salesperson as of the date of commencement of employment by Medline or in which Salesperson had an interest or right, other than those patented prior to such employment, using Medline's disclosure form. Any inventions or discoveries not so patented or listed shall be deemed made or conceived during Salesperson's employment by Medline.

11.        **Return of Property, Device Inspection**.  Salesperson will preserve records of Medline customers, prospects, suppliers, and other business relationships; Confidential Information; intellectual property; and other Proprietary Developments that Salesperson participates in or maintains in the regular course of business for Medline. At the end of Salesperson's employment, Salesperson will immediately return to Medline any and all such records without deleting, destroying, or otherwise damaging the utility of same. No such materials may be retained by Salesperson without Medline's specific written consent as to the particular item at issue. Upon request, Salesperson shall turn over to Medline for inspection any personal storage devices such as cell phones, laptops, or computers identified by Medline as items Salesperson has used or is reasonably believed to have used to conduct Medline business or to store any information related to Medline's Business so that Medline can inspect the device and insure that all Medline materials have been returned and not copied or retained in violation of this Agreement.

12.        **Reformation**.  Should any restriction on Salesperson created by this Agreement (other than Section 15 below) be deemed unreasonable or unenforceable as written, then Salesperson and Medline recognize and agree that a court may (where permitted under applicable law) modify any unreasonable or unenforceable element of the restriction (such as time, geography, or scope of activity restrained) to make it reasonable and enforceable or enforce it only to the extent it is reasonable and enforceable to the maximum amount allowed by law to protect Medline's legitimate business interests. Except as otherwise provided in Section 15, the provisions of this Agreement are severable, and to the extent that any illegal or unenforceable provision of this Agreement cannot be cured by reformation, then such offending portion or language shall be stricken from this Agreement and the remainder of this Agreement shall continue in effect.

13.     **Survival**. Those provisions of this Agreement which, by their terms, apply to Salesperson's conduct after employment shall survive beyond the end of Salesperson's employment and beyond termination of this Agreement in accordance with their terms unless otherwise expressly agreed by Salesperson and Medline in writing. This Agreement will, likewise, continue to apply and be valid notwithstanding any change in Salesperson's duties, responsibilities, position, or title. The existence of a cause of action by Salesperson against Medline shall not constitute a defense to enforcement of the restrictions on Salesperson contained in this Agreement. This Agreement will be deemed to continue in effect during any periods of renewal of Salesperson's employment, including, but not limited to, periods of employment following promotions or transfers to other related entities or successors, or during any subsequent re-employment by Medline. Nothing in this Agreement shall eliminate, reduce, or otherwise remove any legal duties or obligations that Salesperson would otherwise have to Medline through common law or statute.

14.     **Special Remedies**. Salesperson agrees that if Salesperson breaches or threatens to breach the covenants and restrictions of this Agreement, Medline will suffer irreparable harm and will be entitled to secure: specific performance of the Agreement, injunctive relief to avoid or prevent breaches, equitable tolling, and recovery of attorneys' fees and costs incurred in securing such relief; in addition to and not in lieu of damages and other remedies that would otherwise be available, in each only to the extent permitted by applicable law. If Salesperson resides in and is subject to the law of California, or another state which would convert the recovery of attorney's fees as set forth in this Section 14 to a reciprocal obligation or an obligation where the prevailing party would recover fees and costs, then such recovery of attorneys' fees and costs provision shall not apply and each party will bear its own attorneys' fees and costs. Nothing in Section 15 (Mutual Agreement to Arbitrate) shall preclude Medline or Salesperson from obtaining preliminary injunctive relief in any court of competent jurisdiction, to prevent irreparable harm pending arbitration on the merits of any actual or potential violations of this Agreement. Any such application for preliminary injunctive relief shall not be deemed incompatible with or to constitute a waiver of the agreement in Section 15 to arbitrate Covered Disputes (as defined in Section 15). All final determinations on the merits for Covered Disputes will be decided in arbitration consistent with Section 15.

15.     **Mutual Agreement to Arbitrate**.

        (a)     Covered Disputes. Salesperson and Medline expressly acknowledge and agree to submit to final and binding arbitration all claims, disputes ,or any other matters relating to or arising out of (i) this Agreement, or the interpretation, application or enforcement of its terms, (ii) Salesperson's application for employment, employment, terms and conditions of employment, or termination of employment with Medline, including, without limitation, any claims arising under the common law and/or any federal, state or local, statutes, regulations, executive orders or laws ("Covered Disputes").

        (b)     Federal Arbitration Act. This Agreement is governed by and enforceable under the Federal Arbitration Act (9 U.S.C. § 1 *et seq.*) ("FAA"), to the maximum extent permitted by applicable law. Salesperson and Medline agree that they are engaged in interstate commerce as part of the Business and Salesperson's employment with Medline.

        (c)     Reformation. If any part of this Section 15 is in conflict with any applicable law or found to be unenforceable, the law shall govern, and that part of this Section 15 shall be reformed and construed to the maximum extent possible in conformance with the applicable law, and the remainder of this Section 15 will be unaffected and enforceable.

        (d)     JAMS Rules. Salesperson and Medline agree that Covered Disputes shall be resolved by final and binding arbitration before one neutral arbitrator, and not by jury trial, in accordance with the Judicial Arbitration and Mediation Services, Inc.'s Employment Arbitration Rules & Procedures and Policy on

Employment Arbitration Minimum Standards of Procedural Fairness ("JAMS Rules") then in effect, and held (unless Salesperson and Medline agree in writing otherwise) within 45 miles of and in the same state where Salesperson is or was last employed by Medline. The arbitrator shall be an attorney familiar with the law governing the issues to be arbitrated or a retired judge. The JAMS Rules may be found at https://www.jamsadr.com/rules-employment or requested from Medline through Alan Satyr, Associate General Counsel, (Telephone: (847) 643-4367, email: asatyr@medline.com). If for any reason JAMS will not administer the arbitration, either party may apply to a court of competent jurisdiction with authority over the location where the arbitration will be conducted for appointment of a neutral arbitrator. All claims in arbitration are subject to the same statutes of limitation that would apply in court. Salesperson and Medline shall follow the JAMS Rules applicable to initial filing fees, but in no event will Salesperson be responsible for any portion of those fees in excess of the JAMS initial case management fee. Medline otherwise shall pay all costs and expenses unique to arbitration, including without limitation the arbitrator's fees. Discovery will be conducted in accordance with the JAMS Rules. The arbitrator must follow applicable law and may award only those remedies that would have applied had the matter been heard in court. The arbitrator's decision must be in writing and contain findings of fact and conclusions of law. Judgment may be entered on the arbitrator's decision in any court having jurisdiction.

(e)       Waiver of Jury Trials.  This Section 15 constitutes a waiver of any right to a jury trial. Salesperson knowingly and willingly waives any right that Salesperson has under applicable law to a trial by jury in any dispute arising out of or in any way related to this Agreement, or the issues raised by any such dispute.

(f)       Waiver of Class, Collective and Representative Actions.  Except where prohibited by applicable law, both Medline and Salesperson agree to bring any Covered Dispute in arbitration on an individual basis only, and not on a class, collective or representative basis. There will be no right or authority for any Covered Disputes to be brought, heard or arbitrated as a class, collective or representative action, or as a member in such class, collective or representative proceeding. This Section 15 requires that Salesperson bring any individual claims under the California Labor Code Private Attorneys General Act of 2004 (Cal. Lab. Code § 2698 *et seq.*) in arbitration as permitted by the United States Supreme Court in *Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906 (2022). Notwithstanding any other provision of this Agreement or the JAMS Rules, disputes regarding the validity, enforceability or breach of Section 15(f) may be resolved only by the court of competent jurisdiction and not by an arbitrator. In any case in which (1) the dispute is filed as a class, collective or representative action and (2) there is a final judicial determination that all or part of this waiver is unenforceable, the class, collective and/or representative action to that extent must be litigated in a civil court of competent jurisdiction, but the portion of Section 15(f) that is enforceable shall be enforced in arbitration. Section 15(f) shall be severable in any case in which the dispute is filed as an individual action and severance is necessary to ensure that the individual action proceeds in arbitration.

(g)       Disputes Not Covered.  Salesperson acknowledges that this Section 15:

(i)       Does not prevent Salesperson from making a report to, filing a claim or charge, or cooperating in an investigation with a government agency, including without limitation the Equal Employment Opportunity Commission, U.S. Department of Labor, U.S. Securities and Exchange Commission, National Labor Relations Board, or Office of Federal Contract Compliance Programs. This Section 15 also does not prevent federal administrative agencies from adjudicating claims and awarding remedies based on those claims, even if the claims would otherwise be covered by this Section 15.

(ii)     Does not apply to claims for workers compensation or unemployment insurance benefits.

(iii)    Does not cover disputes between Salesperson and Medline that may not be subject to predispute arbitration agreement as provided by an Act of Congress. If Section 8116 of the Department of Defense Appropriations Act of 2010 (Pub. L.111-118) or its successor statutes remains in effect and is applicable to Medline, this Section 15 does not require arbitration of claims under Title VII of the Civil Rights Act of 1964, or any tort related to, or arising out of, sexual assault, harassment, including battery, intentional infliction of emotional distress, false imprisonment, or negligent hiring, supervision, or retention.

(iv)    Does not apply to litigation between Salesperson and Medline pending in a state or federal court or arbitration as of the date of Salesperson's receipt of this Agreement ("Pending Litigation"). However, if the Pending Litigation is subject to a prior or existing agreement to arbitrate, that agreement will remain in full force and effect and continue to apply to the pending litigation.

(h)     Nothing in this Section 15 prevents or excuses a party from satisfying any conditions precedent and/or exhausting administrative remedies under applicable law before bringing a claim in arbitration.

16.     **Amendments and Non-Waiver**.  No modification, waiver, amendment or addition to any of the terms of this Agreement shall be effective unless set forth in a writing signed by Salesperson and Medline or undertaken by a court in accordance with Sections 12 and 15. The failure of Medline to enforce any provision of this Agreement shall not be construed to be a waiver of such provision or of the right of Medline thereafter to enforce each and every provision hereof.

17.     **Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of the state where Salesperson worked, without reference to the principles of conflicts of laws. The preceding sentence does not apply to Section 15, which is governed by the FAA.

18.     **Jurisdiction & Venue for Court Actions**.  To the extent that either Medline or Salesperson is required to initiate any court action to enforce any right or obligation under this Agreement, Salesperson and Medline agree to irrevocably submit to the exclusive jurisdiction of the Circuit Court of Lake County, Illinois, and the United States District Court of the Northern District of Illinois, and irrevocably agree that all claims in respect of any such action or proceeding shall be exclusively heard and determined in such courts. Accordingly, with respect to such court action, Salesperson (a) submits to the personal jurisdiction of such courts; (b) consents to service of process from such courts; and, (c) waives any other requirement (whether imposed by statute, rule of court, or otherwise) with respect to personal jurisdiction or venue in such courts.  Provided, however, for purposes of this Section 18, to the extent that the laws of any state prohibit exclusive jurisdiction in the Illinois jurisdictions provided above, the exclusive jurisdiction shall be in a court of competent jurisdiction in the state where Salesperson resides or the state where the Salesperson resided or worked at the time of termination of employment with Medline.

19.     **Successors and Assigns**.  Medline shall have the right to assign this Agreement to its successors and assigns, and this Agreement shall inure to the benefit of and be enforceable by such successors and assigns. Salesperson agrees that this Agreement may be enforced by Medline's successors and assigns without the need for further notice to or consent by Salesperson.

20.     **At-Will Employment**. Salesperson's employment with Medline is at-will. Salesperson understands that this Agreement does not alter the nature of Salesperson's at-will employment, or constitute a contract of employment for any specific term. Medline and Salesperson may end the employment relationship at any time, for any reason, unless a specific term of employment has been agreed to in writing signed by a principal or officer of Medline.

21.     **Time to Review & Seek Counsel**. By executing this Agreement, Salesperson agrees that Salesperson has been provided with sufficient time to review and consider this Agreement, has had an opportunity to seek the advice of legal counsel before entering into this Agreement, and enters into this Agreement voluntarily. Salesperson understands that this is a legally binding document.

22.     **Headings**. The headings of the provisions of this Agreement are for convenience only and shall not affect in any way the meaning or interpretation of this Agreement or any of its provisions.

23.     **Entire Agreement**. This Agreement constitutes the entire agreement between Salesperson and Medline relating to the subject matter of this Agreement and supersedes all prior agreements and understandings, whether written or oral. Notwithstanding this Section, during Salesperson's employment with Medline, Salesperson is to adhere to the Medline Employee Handbook and any other Medline policy, including the terms of the sales commissions program.

24.     **Counterparts**. This Agreement may be executed in several counterparts, each of which shall be deemed an original, and all of which shall constitute but one and the same instrument.

**BY EXECUTING THIS AGREEMENT BELOW, SALESPERSON ACKNOWLEDGES THAT PRIOR TO SIGNING THE AGREEMENT, SALESPERSON HAS BEEN GIVEN THE OPPORTUNITY TO REVIEW THE AGREEMENT IN ITS ENTIRETY, HAS READ AND FULLY UNDERSTANDS THE RESTRICTIONS AND OBLIGATIONS CONTAINED IN THE AGREEMENT, INCLUDING, WITHOUT LIMITATION, A MUTUAL MANDATORY AGREEMENT TO ARBITRATE COVERED DISPUTES WHICH INCLUDES A JURY TRIAL WAIVER AND WAIVER OF CLASS, COLLECTIVE AND REPRESENTATIVE ACTIONS (SECTION 15), AND HAS VOLUNTARILY ENTERED INTO THIS AGREEMENT.**

MEDLINE INDUSTRIES, LP, an Illinois company:          SALESPERSON:

By: *Alan Satyr*                                                            Ausiello, Al
_____                          _____
Alan Satyr                                                                  Full Name
Associate General Conusel

                                                                                    *Al Ausiello*
                                                                                    _____
                                                                                    Al Ausiello (Jan 31, 2025 09:37 EST)

                                                                                    Salesperson Signature

APPENDIX A - State Specific Modifications to the Agreement

| State | Modification to the Agreement |
|---|---|
| Alabama | ·      The post-employment restrictions in Section 7(b), including all subparts, shall only last for a period of twelve (12) months.<br>·      "Covered Customer" definition at Section 3(e) is modified as follows:<br>"**Covered Customer**" is a person or entity that has an active business relationship with Medline and (i) Salesperson or a person acting under Salesperson's supervision had business-related contact or dealings with on behalf of Medline during the Look Back Period (defined below), (ii) about which Salesperson obtained Confidential Information during the Look Back Period, (iii) Salesperson knows or reasonably should know Medline has made sales and/or provided services to in the preceding year, and/or (iv) Salesperson knows or reasonably should know Medline has a pending proposal for sales or services as of the date Salesperson's employment with Medline ends.<br>·      "Covered Supplier" definition at Section 3(g) is modified as follows:<br>"**Covered Supplier**" is an active supplier of Medline as to which the Salesperson or a person acting under Salesperson's supervision had significant business-related contact or dealings with on behalf of Medline during the Look Back Period. |
| Arizona | ·      The post-employment restrictions in Section 9(a), including all subparts, shall be limited to the Restricted Area. |
| California | ·      The post-employment restrictions in Section 7(b), Section 8(a) and Section 9(a) shall not apply, including all subparts.<br>·      The jury trial waiver, referenced in Section 15 and in the acknowledgment language before the signature block, shall not apply. |
| Colorado | ·      The post-employment restrictions in Section 7(b), including all subparts:  (i) shall only apply if Salesperson's total gross compensation from Medline exceeds the statutory minimum provided by Colorado state law for the current fiscal year and (ii) are for the protection of trade secrets and shall only be enforced to |

| | |
|---|---|
| | the extent to protect Medline's legitimate business interest in protecting trade secrets.<br>· The post-employment restrictions in Section 8(a), including all subparts, shall: (i) only apply if Salesperson's total gross compensation Medline compensation exceeds the statutory minimum provided by Colorado state law for the current fiscal year and (ii) only be enforced to the extent to protect Medline's legitimate business interest in protecting trade secrets.<br>· To the extent that Salesperson is a current employee and is executing this Agreement in connection with a promotion or other job change, Salesperson, by signing this Agreement, acknowledges that Medline provided Salesperson with written notice containing the terms of the post-employment restrictions in Section 5, Section 7(b) and Section 8(a), including all subparts, at least fourteen (14) days prior to the date that either the Agreement becomes effective or the effective date of any additional compensation provided or a change in Salesperson's terms or conditions of employment that provided consideration for the restrictions in in Section 5, Section 7(b) and Section 8(a), including all subparts.<br>· If Salespersons is a new Medline employee, Salesperson, by signing this agreement, acknowledges that Medline provided Salesperson with written notice containing the terms of the post-employment restrictions in Section 5, Section 7(b) and Section 8(a), including all subparts, prior to the Salesperson's acceptance of Medline's offer of employment. |
| Georgia | · The jury trial waiver, referenced in Section 15 and in the acknowledgment language before the signature block, shall not apply |
| Illinois | · The post-employment restrictions in Section 7(b), including all subparts, shall only apply if Salesperson's annualized rate of earnings from Medline exceeds the statutory minimum provided by Illinois state law for the current fiscal year.<br>· The post-employment restrictions in Sections 8(a) and 9(a), including all subparts, shall only apply if Salesperson's annualized rate of earnings from Medline exceeds the statutory minimum provided by Illinois state law in the current fiscal year.<br>· Salesperson, by signing this Agreement, acknowledges that Salesperson has been given at least two (2) weeks' notice to review the terms of the post- |

| | |
|---|---|
| | employment restrictions in Sections 7(b), 8(a) and 9(a), including all subparts. |
| Louisiana | ·    The Restricted Area shall specifically include the following geographical locations:<br>o   Louisiana parishes: Acadia, Allen, Ascension, Assumption, Avoyelles, Beauregard, Bienville, Bossier, Caddo, Calcasieu, Caldwell, Cameron, Catahoula, Claiborne, Concordia, De Soto, East Baton Rouge, East Carroll, East Feliciana, Evangeline, Franklin, Grant, Iberia, Iberville, Jackson, Jefferson, Jefferson Davis, Lafayette, Lafourche, La Salle, General, Livingston, Madison, Morehouse, Natchitoches, Orleans, Ouachita, Plaquemines, Pointe Coupee, Rapides, Red River, Richland, Sabine, St. Bernard, St. Charles, St. Helena, St. James, St. John the Baptist, St. Landry, St. Martin, St. Mary, St. Tammany, Tangipahoa, Tensas, Terrebonne, Union, Vermilion, Vernon, Washington, Webster, West Baton Rouge, West Carroll, West Feliciana, and Winn.<br>o   Texas counties: Cass, Marion, Harrison, Panola, Shelby, Sabine, Newton, Orange, and Jefferson.<br>o   Arkansas counties: Miller, Lafayette, Columbia, Union, Ashley and Chicot.<br>o   Mississippi counties: Issaquena, Warren, Clairborne, Jefferson, Adams, Wilkinson, Amite, Pike, Walthall, Marion, Pearl River and Hancock.<br>·    The post-employment restrictions in Section 7(b) and Section 8(a), including all subparts, are limited to the parishes identified in the preceding paragraph. |
| Maine | ·    The post-employment restrictions in Section 7(b), including all subparts, shall only apply if Salesperson's total gross compensation from Medline exceeds the statutory minimum provided by Maine state law for the current fiscal year.<br>·    Salesperson, by signing this Agreement, acknowledges that, prior to Medline making a job offer, Medline disclosed, in writing, that Salesperson would be required to enter into a post-employment non-compete covenant.<br>·    Salesperson, by signing this Agreement, acknowledges that Medline provided Salesperson with a copy of the terms of the post-employment restrictions in Section 7(b), including all subparts, and at least three (3) business days for review. |
| Massachusetts | ·    The post-employment restrictions in Section 7(b), including all subparts, shall not apply if Salesperson's |

employment is terminated without Cause or if Salesperson is terminated as part of a reduction in force. As used herein, "Cause" is: (i) a material breach by Salesperson of any of Salesperson's material obligations under any applicable agreement with Medline; (ii) Salesperson's conviction of or entering a plea of guilty or nolo contendere to, or admission to facts sufficient for a finding of guilt for, any crime constituting a felony or any misdemeanor involving fraud, dishonesty and/or moral turpitude under federal, state, local or foreign law; (iii) Salesperson's neglect, refusal, or failure to meet performance expectations, perform job duties, or comply with a lawful direction; (iv) Salesperson's commission of any act or omission involving dishonesty, disloyalty or fraud with respect to Medline; (v) Salesperson's breach of a statutory or common law duty of loyalty or fiduciary duty to Medline; (vi) Salesperson's violation of Medline's policies and procedures; (vii) any other willful misconduct by Salesperson which is or intends to be materially injurious to Medline's financial condition or business reputation, or is otherwise materially injurious to Medline; or (viii) any other reason recognized under the common law. Nothing in this shall be construed to eliminate or modify the "at-will" nature of the parties' relationship.

·       The post-employment restrictions in Section 7(b), including all subparts, shall only apply for twelve (12) months following the end of Salesperson's employment with Medline; provided that, if Salesperson breaches any of Salesperson's fiduciary duties to Medline and/or has unlawfully taken, physically or electronically, any Medline records, then the post-employment restrictions in Section 7(b), including all subparts, shall apply for eighteen (18) months following the end of Salesperson's employment with Medline.

·       As additional consideration for the post-employment restrictions in Section 7(b), Medline will pay Salesperson, and Salesperson agrees to accept, a payment of $[5,000] (the "Special Consideration"). Salesperson further agrees that the foregoing "Special Consideration" shall be paid at or about the time of termination in lieu of garden leave or other payments therefor.

·       If Salesperson is a current employee and is executing this Agreement in connection with a promotion or other job change, Salesperson, by signing this Agreement, acknowledges that Medline provided

| | |
|---|---|
| | Salesperson with written notice containing the terms of the post-employment restrictions in Section 7(b), including all subparts, at least ten (10) business days prior to the date that the Agreement becomes effective.<br><br>· If Salesperson is a new Medline employee, Salesperson, by signing this agreement, acknowledges that Medline provided Salesperson with written notice containing the terms of the post-employment restrictions in Section 7(b), including all subparts, prior to the Salesperson's acceptance of Medline's offer of employment or at least ten (10) business days prior to Salesperson's commencement of employment with Medline. |
| Minnesota | · The Noncompete Covenant contained in Section 7(b) will not apply to Salesperson. Medline and Salesperson agree that the Non-Solicitation Covenants in Section 8 are narrow in nature and are intended to be construed and applied in accordance with what is a permissible "nonsolicitation agreement" under Minnesota Statutes Section 181.988 (the "Minnesota Noncompete Act") and not what is deemed a "covenant not to compete" under such law. As it concerns claims arising under the Minnesota Noncompete Act, nothing in the Agreement will be construed to require Salesperson to adjudicate outside of Minnesota a claim arising in Minnesota or deprive Salesperson of the substantive protection of Minnesota law with respect to a controversy arising in Minnesota. |
| Montana | · Medline and Salesperson understand that Montana is not an at-will employment state and the at-will nature of employment exists only during Salesperson's first full calendar year of employment with Medline. |
| Nevada | · "Covered Customer" definition at Section 3(e) is modified as follows:<br>"**Covered Customer**" is a person or entity that has an active business relationship with Medline and (i) Salesperson or a person acting under Salesperson's supervision had business-related contact or dealings with on behalf of Medline during the Look Back Period (defined below), (ii) about which Salesperson obtained Confidential Information during the Look Back Period, (iii) Salesperson knows or reasonably should have known Medline has made sales and/or provided services to in the preceding year, and/or (iv) Salesperson knows or reasonably should have known |

| | |
|---|---|
| | Medline has a pending proposal for sales or services as of the date Salesperson's employment with Medline ends.<br><br>· "Covered Supplier" definition at Section 3(g) is modified as follows:<br><br>"**Covered Supplier**" is an active supplier of Medline as to which the Salesperson or a person acting under Salesperson's supervision had significant business-related contact or dealings with on behalf of Medline during the Look Back Period.<br><br>· "Solicit" definition at Section 3(k) is modified as follows:<br><br>"**Solicit**" and related terms such as "soliciting" or engaging in "solicitation" mean to engage in contacts, acts, or communications, whether directly engaged in by Salesperson in person or indirectly engaged in through the use or control of others, that cause or induce, attempt to cause or induce, or can be reasonably expected to cause or induce a party to engage in a particular action or conduct, regardless of whether or not the communication at issue is in response to a request for information or not. |
| New Hampshire | · If Salesperson is a new Medline employee, Salesperson, by signing this Agreement, acknowledges that Medline provided Salesperson with written notice containing the terms of the post-employment restrictions in Sections 7(b), 8(a) and 9(a), including all subparts, prior to Salesperson's acceptance of an offer of employment with Medline. |
| New York | · "Covered Customer" definition at Section 3(e) is modified as follows:<br><br>"**Covered Customer**" is a person or entity that (i) Salesperson or a person acting under Salesperson's supervision had business-related contact or dealings with on behalf of Medline during the Look Back Period (defined below), (ii) about which Salesperson obtained Confidential Information during the Look Back Period, (iii) Salesperson knows or reasonably should have known Medline has made sales and/or provided services to in the preceding year, and/or (iv) Salesperson knows or reasonably should have known Medline has a pending proposal for sales or services as of the date Salesperson's employment with Medline ends; provided that person or entity that otherwise meets this definition is not a Covered Customer if such person or entity became a Medline customer as a result |

| | |
|---|---|
| | of Salesperson's independent contact and business development efforts with the person or entity, independent from Salesperson's employment with or prior engagement with Medline as an independent contractor. |
| North Carolina | ·     The jury trial waiver, referenced in Section 15 and in the acknowledgment  language before the signature block, shall not apply. |
| North Dakota | ·     The post-employment restrictions in Section 7(b) and Section 8(a), including all subparts, shall not apply. |
| Oklahoma | ·     The post-employment restrictions in Section 7(b), including all subparts, and 9(a)(i) shall not apply.<br>·     Only with respect to Section 8(a)(i), the term "Solicit," as defined at Section 3(k), is modified as follows:<br>"**Solicit**" and related terms such as "soliciting" or engaging in "solicitation" mean to engage in contacts, acts, or communications, directly engaged in by Salesperson, that cause or induce, attempt to cause or induce, or can be reasonably expected to cause or induce a party to engage in a particular action or conduct, regardless of who first initiates the contact or communication, or whether or not the communication at issue is in response to a request for information or not. |
| Oregon | ·     The post-employment restrictions in Section 7(b), including all subparts, shall only apply if Salesperson's annual gross salary and commissions, calculated on an annual basis, from Medline exceeds the statutory minimum provided by Oregon state law for the current fiscal year.<br>·     The post-employment restrictions in Section 7(b), including all subparts, shall only apply for twelve (12) months following the end of Salesperson's employment with Medline.<br>·     If Salesperson is a new Medline employee, Salesperson, by signing this Agreement, acknowledges that Medline provided Salesperson with a written offer of employment at least two (2) weeks prior to Salesperson's commencement of employment with Medline and that written offer provided notice to Salesperson of the requirement to enter into a covenant containing the post-employment restrictions in Section 7(b), including all subparts. |

| Utah | · The post-employment restrictions in Section 7(b), including all subparts, shall only apply for twelve (12) months following the end of Salesperson's employment with Medline. |
|---|---|
| Virginia | · The post-employment restrictions in Section 7(b), including all subparts, shall only apply if Salesperson's calculated average weekly earnings from Medline exceeds the statutory minimum provided by Virginia state law for the current fiscal year. |
| Washington D.C. | · The post-employment restrictions in Section 7(b), including all subparts, shall only apply if Salesperson's annualized earnings from Medline exceeds the statutory minimum provided by the laws of the District of Columbia in the current fiscal year.<br>· The post-employment restrictions in Section 7(b), including all subparts, shall only apply for twelve (12) months following the end of Salesperson's employment with Medline.<br>· Salesperson, by signing this Agreement, acknowledges that Medline provided a written copy of the terms of the post-employment restrictions in Section 7(b), including all subparts, to Salesperson at least fourteen (14) days prior to Salesperson's expected commencement of employment with Medline or required execution of the Agreement. |
| Washington | · The post-employment restrictions in Section 7(b), including all subparts, shall only apply if Salesperson's minimum qualifying annual compensation from Medline exceeds the statutory minimum provided by Washington state law for the current fiscal year.<br>· If Salesperson is a new Medline employee, Salesperson, by signing this Agreement, acknowledges that Medline provided Salesperson with a written copy of the terms of the post-employment restrictions in Section 7(b), including all subparts, no later than the time Salesperson accepted an offer of employment with Medline. |
| Puerto Rico | · The post-employment restrictions in Sections 7(b), 8(a), and 9(a), including all subparts, shall only apply for twelve (12) months following the end of Salesperson's employment with Medline. |

# Exhibit B
# Private Information
# Handling Guide



# Medline Information Handling Guide



# Table of Contents

**1. Introduction** ...................................................................................................................**3**

   1.1 Purpose of the Guide ............................................................................... 3
   1.2 Scope and Audience.................................................................................3
   1.3 Importance of Proper Information Handling .............................................3
   1.4 Ownership of Medline Information ........................................................... 3

**2. Roles and Responsibilities** ............................................................................. **4**

   2.1 Information Owner ....................................................................................4
   2.2 Medline Personnel and Managers .......................................................... 5
   2.3 System Administrator ............................................................................... 5
   2.4 Information Governance Team ................................................................ 6

**3. Information Classification** ............................................................................... **6**

   3.1 Confidential vs. Public Information ..........................................................6
      3.1.1 Confidential ..................................................................................6
      3.2.2 Public .........................................................................................7
   3.2 Information Handling .............................................................................. 8
      3.2.1. Confidential Red ....................................................................... 8
      3.2.2. Confidential Yellow ..................................................................10
      3.2.3. Confidential Green ...................................................................10

**4. External Communications** ............................................................................ **11**

   4.1 Media Relations ....................................................................................11
   4.2 Social Media..........................................................................................11

**5. Information and Records Management**........................................................**12**

   5.1 Record Owner .......................................................................................12
   5.2 Record Retention .................................................................................. 12
   5.3 Litigation Holds.....................................................................................13

**6. Acceptable Use of Information Technology Resources** ............................**13**

**7. Information Handling Violation Reporting** ..................................................**14**

   7.1. Information Security Incident Reporting .............................................14

**8. Appendices** ...................................................................................................**16**

   Appendix A: Glossary of Key Terms ...........................................................17
   Appendix B: Determining Information Classification.................................... 19
   Appendix C: Medline Information Handling Requirements ..........................20
   Appendix D: Additional Resources ............................................................. 21



# 1. Introduction

As Medline's business continues to expand, the volume of information we are required to manage and communicate will continue to grow significantly. For compliance and risk mitigation purposes, it's essential that we adopt a more structured and uniform approach to how we handle and share information across the organization and beyond.

## 1.1 Purpose of the Guide
This guide is designed to help personnel appropriately handle Medline Information by classifying it correctly and sharing it responsibly, which reduces the risk of inappropriate disclosure. Appropriate information handling is critical to safeguarding Medline's reputation, preventing data breaches, and ensuring operational continuity. This guide should be interpreted in the context of all applicable laws; the Company's bylaws and other corporate governance documents; and the Medline Policies referenced in Appendix D, which this guide summarizes but does not supersede.

## 1.2 Scope and Audience
This guide applies to all employees, contractors, consultants, and other third-party vendors (collectively, "Medline Personnel") who manage, process, or access Medline Information. Everyone with access to Medline Information is responsible for understanding and adhering to these guidelines to protect the organization and its stakeholders.

## 1.3 Importance of Proper Information Handling
"Medline Information" should be interpreted broadly, and refers to all information, in any form or format, digital or analogue, tangible or intangible, written or oral, pertaining to or belonging to Medline and / or its businesses, operations, Medline Personnel, customers, vendors, or third parties. Medline Information represents a significant corporate asset. Mishandling Medline Information can lead to severe legal, financial, and reputational consequences for you and for Medline. Some Medline Information is confidential and must only be disclosed to those who have a legitimate business need for the information. Proper classification and protection of Medline Information supports:
- Compliance with applicable laws and regulations, including data privacy laws (*e.g.,* GDPR, HIPAA).
- The prevention of unauthorized access, leaks, or breaches.
- The maintenance of stakeholder trust by demonstrating a commitment to confidentiality and security.

## 1.4 Ownership of Medline Information
All information created, received, or used during business activities is considered Medline Information and is the property of the company. This includes, but is not limited to, all information in



any tangible form, such as documents, emails, reports, and any other application in which information is communicated. Medline Personnel are the stewards of Medline Information and are expected to handle it in accordance with this guide and only for business purposes.

**What to know:**
- Know whether you are the "Information Owner" as that imposes additional responsibilities. Merely being in possession of Medline Information does not make you the Information Owner. Refer to section 2.1 for a description of Information Owner responsibilities.
- Third-party information shared with Medline may only be used for Medline Business and in accordance with agreed upon terms with the third-party.

**What to do:**
- Handle Medline Information based on the level of protection required (Confidential Red, Yellow, Green, or Public). Check with the Information Owner if you are unclear on the level of protection.

**What to watch out for:**
- Unauthorized use, distribution, or disclosure of Medline Information is prohibited and may result in disciplinary action.

## 2. Roles and Responsibilities

### 2.1 Information Owner

Information Owners are the individuals within Medline who have the authority over specific information and are responsible for establishing controls over its creation, classification, collection, processing, dissemination, and disposal. These individuals may be Information Owners based on their role or specific interaction with the information at issue.

- Key responsibilities include overseeing the complete lifecycle of information; defining who is authorized to access the information; ensuring that the information is handled in compliance with relevant legal, regulatory, and organizational policies; and maintaining the accuracy, relevance, and security of the information under their control.

To identify the information owner, Medline Personnel should follow these steps:
- Identify which department or function is most closely related to the content (*e.g.*, Finance, HR, Legal). Contact a person in that department likely to be knowledgeable about the subject of the information who can direct you to the Information Owner.



- If you cannot identify the Information Owner through the previous step, review the Information Governance Source site for additional guidance on Information Ownership. If questions persist, reach out the Information Governance team at IG@medline.com.

## 2.2 Medline Personnel and Managers

Medline Personnel must understand Medline's information classification definitions to support appropriate information handling including obligations, limitations, and restrictions.

During the course of business, Medline Personnel may learn information that is considered confidential by Medline, including: pricing and commercial terms with customers and suppliers; marketing or strategic plans; customer lists; employee records and legal documents. This information represents some of Medline's most valuable assets. Care must be taken to ensure this information is protected and not disclosed to unauthorized persons. All Medline Personnel play a critical role in ensuring the proper handling and protection of information.

Manager Responsibilities:

Managers have additional responsibilities to oversee and ensure compliance within their teams. These include:

- Ensuring that team members understand the organization's information handling and classification policies, and complete assigned training.
- Regularly checking that team members adhere to established protocols for information handling, classification, and reporting.
- Assisting team members in complying with security incidents and breach protocols.

## 2.3 System Administrator

System administrators are responsible for the technical implementation of the policies defined by Information Governance and Information Owners. They ensure information is stored securely, backed up, and accessible only to authorized individuals. They handle the day-to-day management and protection of information.

- Key responsibilities include ensuring the physical or digital storage of information is secure, including implementing required controls such as encryption and access management; managing the backup processes to protect against data loss and ensuring data can be restored when necessary; implementing and enforcing the access policies defined by Information Owners; maintaining the systems and infrastructure that store and manage information.



## 2.4 Information Governance Team

The Information Governance team is tasked with creating and maintaining policies and standards to safeguard Medline Information and technology. Their responsibilities include:

- Defining the requirements for securely storing, accessing, and transmitting information.
- Offering training, support and guidance to Medline Personnel and managers regarding how to meet their information handling responsibilities.

# 3. Information Classification

## 3.1 Confidential vs. Public Information



### 3.1.1 Confidential

Confidential information is information that (a) provides Medline or our partners with a competitive or economic advantage; or (b) is sensitive in nature, causing Medline or our partners legal, financial or reputational harm if unintentionally disclosed; or (c) is otherwise not intended for public disclosure. This includes financial, business, legal, personal, and other non-public information about Medline, its employees, or any of its business partners (customers, vendors, and other third parties).

- Medline has three levels of confidentiality (Red, Yellow, and Green) that direct how the information should be handled and protected.



**What to do:**
- Handle all information that is not intended for public disclosure as confidential information.
- Familiarize yourself with the requirements to protect each classification level.
- Only store confidential information on Medline-owned, authorized or licensed Medline information technology (Information Technology Resources).
- Whenever possible, label the information with the correct information protection classification (*e.g.*, Medline Confidential Red) by adding it as a watermark or in the header or footer of the document.
- Do not forward or share confidential information with your personal, non-Medline software accounts like Gmail or Dropbox accounts.

### 3.1.2   Public

Public information is information that (a) is about Medline and has been broadly disseminated by Medline; (b) is about a Medline partner and has been broadly disseminated by the partner; or (c) is generally known outside the company or available from public sources and is not rumor or speculation about Medline or its partners.

**Examples**
- Press releases
- Information posted on open websites (*e.g.*, job postings, articles, and blogs)
- Approved marketing materials (*e.g.,* product descriptions, packaging, brochures, presentations, mailers, *etc.*)

**What to do:**
- Share with the public if that was the intended audience.
- Access public information from any account or device.
- Discuss openly and distribute freely.
- There are no restrictions on sharing public information with third parties.



## 3.2 Information Handling

Medline Information is classified into four categories: Confidential Red, Confidential Yellow, Confidential Green, and Public, each reflecting various levels of sensitivity and potential impact of unauthorized disclosure.

### Understanding Confidential Information Categories

Confidential Medline Information – whether red, yellow, or green – has value to Medline if it is maintained in confidence. When disclosing confidential information externally, make sure to have a non-disclosure agreement (or NDA) signed before sharing with a third party (other than third parties who owe a professional duty to maintain the information in confidence, such as external legal counsel or auditors).

The distinctions between Confidential Red, Yellow, and Green indicate the differing value and sensitivity of the information. When making determinations about the appropriate classification and treatment of confidential Medline Information, choose the more restrictive option if you're unsure.

### A Note About Personal Data

"Personal data" is any data that directly or indirectly identifies a natural person. This could be as innocuous as a phone number, or as sensitive as a social security number. Medline possesses a tremendous amount of personal data relating to its employees, customers, and other third parties. All personal data is presumptively maintained as confidential Medline Information and may be classified as red, yellow, or green, based on the type, volume, and purpose of the data. As with all confidential Medline Information, the level of protection will coincide with the potential impact of unauthorized disclosure. For instance, protected health information should always be handled as Confidential Red, whereas contact information in an email signature may be handled as Confidential Green.

### 3.2.1   Confidential Red

Confidential Red information is our most highly valued and most sensitive information, and usually relates to a major corporate priority or initiative. For instance, this information may relate to a key long-term strategy or critical business plans, provide a significant competitive advantage (*e.g.*, a trade secret), or itself be highly regulated.

Disclosure of Confidential Red information may cause one or more of the following:
- Significant financial loss, either directly or by loss of opportunity,
- Significant regulatory or contractual liability,
- Severe damage to our reputation or public image,
- A severe loss of market share or the ability to be first to market, or
- A loss of an important customer or business partner.

### Examples



- Unpublished revenue/sales, earnings, margin, cash flow or other financial results or forecasts
- Details about significant lawsuits, claims, or investigations
- Information about unannounced potential mergers, acquisitions, dispositions, or reorganizations
- Highly sensitive personal information such as national identification numbers (*e.g.*, Social Security Numbers), system passwords/credentials, and protected health information

## What to do:

- Do not share with anyone outside of Medline, unless you have received explicit direction from both an Executive Officer and Legal.
- Only share internally with individuals with a strict need to know (*i.e.*, with other Medline personnel if required for the proper execution of your or Medline's responsibilities).
- When sharing such information internally, limit the amount of information to what is required to achieve the stated business purpose and make sure the recipient knows that the information is confidential and subject to restrictions related to its use or dissemination.
- Dissemination internally should only be at the direction of the Information Owner who governs the disclosure, copying and use internally.
- Refrain from sharing information with non-approved recipients and recording conversations and meetings discussing the information.
- Safeguard copies when not in use.



### 3.2.2   Confidential Yellow

Confidential Yellow information is also valuable and sensitive, but the disclosure of which would result in less damage or liability to the company than the disclosure of red information.  This information might be more limited in scope than red information (*e.g.*, may relate to a product line or business unit rather than a corporate priority) and may be more tactical and less strategic. Disclosure may cause the same negative outcomes as listed above for Confidential Red information, but to a lesser degree.

Disclosure of Confidential Yellow information may cause one or more of the following:
- Moderate damage to the company or an individual,
- A loss of customer confidence, or
- A brief disruption or distraction to operations.

#### Examples
- Contracts and other written agreements
- Product costing and pricing information

#### What to do:
- Only share or discuss information with other individuals who also have a need to know.
- Do not share externally without approval of the Information Owner and Legal.
- Only access this information on Medline-registered or managed devices.
- Access using unique, Medline-issued credentials.
- Store hard copies out of sight when not in use.

### 3.2.3   Confidential Green

Confidential Green information is not generally known outside the company or available from public sources and the disclosure of which might impact Medline's competitive advantage.  Much of this information tends to be operational in nature.

#### Examples
- Company policies, procedures and training manuals
- Organizational charts
- Internal announcements

#### What to do:
- Only share with individuals whose job requires them to have access.
- Don't share or access via anonymous links (links that don't require a sign-in).
- Before sharing externally, obtain approval from the Information Owner.



# 4.  External Communications

## 4.1 News Media Relations

When it comes to the news media community, Medline speaks with one clear and consistent voice across different channels and platforms. Without explicit prior authorization from an officer of Medline, you are not permitted to engage with the news media with respect to Medline business.

### What to do:

- Employee engagement with news media or other types of media on behalf of Medline, e.g., podcast appearances, interviews, etc., must be reviewed and approved by Corporate Communications, corporatecommunications@medline.com. If you're outside the US, reach out to the local Communications Department contact.

### What to watch out for:

- Media camera crews are not allowed to film on company premise, "look around" or move past the reception lobby without consent from an authorized company spokesperson or Corporate Communications.  Should a camera crew appear at a Medline facility, quickly engage Corporate Communications, corporatecommunications@medline.com.  If you're outside the US, reach out to the local Communications Department contact.

## 4.2 Social Media

Everything posted to social media related to Medline affects the company's business, brand, and reputation. Use of social media for personal or individual professional purposes must be distinguished from engaging on behalf of Medline.

### What to know:

- Only Medline social media accounts, authorized by the Chief Marketing Officer, have permission to post on behalf of Medline.
- Only Medline Public information may be posted on social media.  If you are unsure whether content is Public, do not share.

### What to do:

- If a need arises to use social media to conduct Medline Business, engage Corporate Marketing. You are not permitted to create an account on your own.
- If endorsing or promoting a Medline product or service on social media, you must clearly disclose your employment relationship in the post and the opinions expressed are your own.
- You may reshare Medline Public information such as newsroom stories or job postings on your social media accounts.
- If you are representing Medline or mentioning your affiliation, you should act professionally, maintaining the company's values and integrity. Avoid engaging in discussions or comments that could harm Medline's reputation or violate compliance standards.



- You should not use Medline's logos, trademarks, or other branding elements in your social media profiles or posts without prior authorization. This helps protect the company's brand integrity and ensures consistent communication.

**What to watch out for:**
- Avoid sharing Confidential **Red**, **Yellow**, or **Green** information on social media.  If you are in doubt, do not share.

## 5. Information and Records Management

Medline Information that is required to meet business, legal, financial, or regulatory requirements are managed as Business Records of the company.  These include the final versions, executed documents, or complete packages of information that demonstrate Medline's decision, action, or commitment. Business Records can be in hardcopy or electronic format.

### 5.1 Record Owner
Business Records are required to be managed by a designated Record Owner who is responsible for managing the lifecycle by ensuring compliance with information handling policies and applicable record retention schedules.

### 5.2 Record Retention
Medline Information is retained based on the content and not on the storage location. The Corporate Record Retention Schedule outlines the required period of time that Business Records need to be readily available.  For locations outside the United States, Medline Personnel must also comply with local record retention regulations. When the retention period has been met, Business Records should be securely disposed.



### 5.3 Litigation Holds

In the event of any current or reasonably anticipated legal action, all potentially relevant Medline Information, including Business Records, must be preserved until the hold is lifted. A litigation hold suspends the destruction of identified potentially relevant information even if the retention period has been met.

**What to know:**
- Business Records must be stored in a designated location for the duration of the retention period listed in the Corporate Record Retention Schedule, or local record retention requirements.
- Records that have met their retention requirement should be destroyed in a way that makes it impossible to reconstruct and read the information regardless of the media format.
- If a litigation hold is issued, all relevant Medline Information must be preserved until the hold is lifted.

**What to do:**
- Familiarize yourself with how long Medline Information is required to be maintained. If you aren't sure, check the Corporate Record Retention Schedule or contact the Information Governance team at IG@medline.com for assistance.
- Actively manage Medline Information, including Business Records, regardless of the format or storage location.
- If you receive a litigation hold notice, immediately preserve all relevant information.

**What to watch out for:**
- Litigation holds apply to all relevant Medline Information regardless of where it resides. This may include any device or account used to discuss or conduct company business.
- Additional copies of Business Records do not need to be saved for the full retention period.

## 6. Acceptable Use of Information Technology Resources

Medline provides its workforce with Information Technology Resources, including computers, phones, and tools such as email, chat, and other software, to further its business objectives. These resources, including Medline Information, are Medline's property and must be used in accordance with company policies intended to protect Medline's operations and information from harm.

**What to know:**
- Accessing, using, or sharing Medline Information for any purpose other than Medline Business is prohibited. Authorized access may only be used to fulfill currently assigned job duties.



- Medline Information must be stored on Medline-owned, authorized, or licensed Information Technology Resources.

**What to do:**
- Initiate all Medline Business communications (*e.g.*, email, video conferencing) with platforms provided or approved by Information Technology.
- Ensure Medline Business is only conducted using Medline-provided user accounts and personal activities are only conducted using personal user accounts.
- Never share passwords or security codes and ensure Medline account passwords do not match those used for non-Medline accounts.

**What to watch out for:**
- Text and other instant messaging (*e.g.*, Microsoft Teams Chat) is not an approved platform for formal Medline Business communications and may only be used for informal communications (*e.g.*, notifying a colleague of running late).
- Medline email is intended only for Medline Business.

## 7. Information Handling Violation Reporting

### 7.1 Information Security Incident Reporting

The mishandling of Medline Information can have serious consequences for the company. Everyone has a responsibility to report potential or known information security incidents immediately. This will allow Medline to quickly evaluate and respond.

**What to know:**
- An information security incident includes any potential or suspected unauthorized access, acquisition, use, disclosure, modification, or destruction of Medline Information or Information Technology Resources. Examples include, but are not limited to:
  - Unauthorized individuals having access to confidential information
  - Files containing confidential information sent to the wrong recipient or removed from a Medline facility without authorization
  - Username/password credentials are inappropriately disclosed or used
  - Information security incidents may occur intentionally or unintentionally and may involve internal or external parties.

**What to do:**
- Report all potential information security incidents including observed or suspected non-compliance with Medline's information handling policies immediately by:
  - Submitting a data security incident report to your local IT help desk;
  - Emailing Privacy at MedlinePrivacyOffice@Medline.com or



  o   File a report through The Medline Ethics & Compliance Reporting Line, [medline.ethicspoint.com,](medline.ethicspoint.com) or by the telephone number listed in the Resources Section of the Code of Conduct. (Anonymous reporting is available as permitted by applicable laws).
- Report lost or stolen Medline managed devices to your local IT help desk within four hours.

**What to watch out for:**
- Information security incidents at service providers and business partners can impact Medline.  These should be reported immediately.



## 8. Appendices



## Appendix A: Glossary of Key Terms

**Business Records** reflect information that is created, transmitted, or received in the course of company business that the company wants, or is required, to retain for business or legal purposes for a minimum period of time as defined in the retention schedule.

**Confidential Green** information is information that is not generally known outside the company or available from public sources and the disclosure of which might impact Medline's competitive advantage.

**Confidential Red** information is our most highly valued and most sensitive information, and usually relates to a major corporate priority or initiative.

**Confidential Yellow** information is valuable and sensitive, but the disclosure of which would result in less damage or liability to the company than the disclosure of red information. This information might be more limited in scope than red information (e.g., may relate to a product line or business unit rather than a corporate priority) and may be more tactical and less strategic.

**Information Owners** are the individuals or roles in the organization who have the authority over specific information and are responsible for establishing the controls for its creation, classification, collection, processing, dissemination, and disposal.

**Information Technology Resources** refers to Medline-owned, licensed, or controlled electronic equipment, devices, facilities, technologies, and information (defined below) including, but not limited to, computer hardware, software, networks, peripheral equipment (*i.e.,* removable media, printers, scanners, and copiers), electronic communications systems (*i.e.,* electronic mail, telephone, voicemail, and fax machines), mobile computing devices, and internet access.

**Litigation Hold** ensures records that may be relevant to litigation are not destroyed, even if it would normally be time to dispose of them under the retention policy. Medline may issue a litigation hold notice to advise Medline Personnel not to delete records that are the subject of the litigation hold.

**Medline Business** refers to any action in the scope or course of a person's employment or retention by Medline.

**Medline Information** is all information, whether distributed within Medline or externally, in any form, format or media, used in connection with Medline's business, including but not limited to information received by Medline from third parties.



**Medline Personnel** refers to all employees, contractors, consultants, and other third-party vendors who manage, process, or access Medline Information.

**Record Owner** is the person, position, or role who controls the content and is responsible for making decisions related to the management of the records lifecycle.



## Appendix B: Determining Information Classification

Answers to the questions listed below are provided to assist Information Owners in properly classifying their information. Medline Personnel should rate each question using a High (H), Medium (M), or Low (L) rating scale. As a rule, the more "High" ratings the information receives, the more restrictive the information classification should be.

| Classification Question | Rating |
|---|---|
| How important is it to the company that this information be known only by authorized people? | |
| How important is it to the company that this information be available to authorized people only? | |
| How important to privacy law compliance is this information? | |
| How important to regulatory compliance is this information? | |
| How serious would the impact be if the information reached an unintended audience? | |
| How likely is it that this information could be used by someone to target employees, customers, suppliers, facilities, or operations? | |
| How valuable would this information be to someone intent on causing harm to the company, its employees, customers, or business partners? | |
| How likely is it that this information could be used in conjunction with publicly available information to cause harm to the company, its employees, customers, or business partners? | |



### Appendix C:  Medline Information Handling Requirements

| Medline Confidential | | | | |
|---|---|---|---|---|
| | **Red** | **Yellow** | **Green** | **Public** |
| **Audience (for electronic, verbal, or hard copy information)** | Restricted to individuals with a strict need to know | Restricted to those in a role or on a team with a need to know | Limited to those whose job requires them to have access | Intended to be shared with the general public. |
| **Electronic Access and Authentication** | Information Owner must explicitly approve all sharing and forwarding; appropriateness of existing access must be reviewed periodically | Access only on Medline-registered or managed devices | Access using Medline-issued unique credentials; cannot access via anonymous links | Access from any account or device |
| **Verbal Communication** | Discuss privately with approved individuals; do not record | Discuss privately with those with a need to know | Be mindful when discussing in public settings (*e.g.*, restaurants, trains) | Discuss openly |
| **Hard Copies** | Lock up when not in use | Store out of sight | Store out of public view | Distribute freely |
| **Third Party Distribution** | Third party's data protection risk must be periodically assessed for appropriateness | Prior execution of a non-disclosure agreement | Prior approval from the Information Owner or a VP or above | No restrictions |



## Appendix D:  Additional Resources

**This guide is based on the following Medline policies:**

- Corporate Records Management Policy
- Medline Litigation Hold Policy
- Information Classification Policy
- Global Acceptable Use Policy

**List of related training courses in Workday (available in English only)**

- Corporate Records Management Policy Training
- Confident Communications at Medline Training
- Global Acceptable Use Policy Training

**Additional resources**

- Information Governance Intranet page
- Information Governance help desk:  IG@medline.com
- The Medline Ethics & Compliance Reporting Line, medline.ethicspoint.com, or by the telephone number listed in the Resources Section of the Code of Conduct. (Anonymous reporting is available as permitted by applicable laws)

# Exhibit C
# Letter to Ausiello



**Levenfeld Pearlstein, LLC**
120 S Riverside Plaza, Suite 1800
Chicago, IL  60606  USA
lplegal.com

**Peter F. Donati**
Partner
pdonati@lplegal.com
T +1 312 476 7590

May 7, 2025

**VIA FEDERAL EXPRESS AND EMAIL**

Al Ausiello
14 Westminster Drive
Nashua, NH  03064

**Re:**     **Contractual Obligations to Medline**

Dear Mr. Ausiello:

This firm represents Medline Industries, LP ("Medline" or the "Company").  We are writing concerning your obligations under your Confidentiality, Protective Covenants & Arbitration Agreement with Medline dated January 30, 2025 (the "Protective Covenants Agreement").  A copy of your Protective Covenant Agreement is enclosed herewith.

As you will recall, you agreed in the Protective Covenants Agreement to abide by a number of restrictions intended to protect the legitimate business interests of Medline, including the following (the capitalized terms below are defined in the Protective Covenants Agreement):

- During your employment with Medline you would not "pursue business activities that compete with Medline…or engage in material preparations to do so."

- For a period of eighteen (18) months after terminating your employment with Medline, you would not "[p]articipate in, manage, supervise, consult with, or provide services within the Restricted Area to a Conflicting Business that are the same as or similar in purpose of function to any services Salesperson provided to Medline during the Look Back Period or that are otherwise likely to result in the use or disclosure of Confidential Information."

- During your employment with Medline and for a period of eighteen (18) months after terminating your employment, you would not solicit Covered Customers or otherwise interfere in the relationship between Medline and such Covered Customers.

- During your employment with Medline and for a period of eighteen (18) months after terminating your employment, you would not hire or assist in the hiring of a Covered Employee or solicit or recruit a Covered Employee to leave employment with Medline.

- During your employment with Medline and thereafter, you would protect and not use or disclose Medline's Confidential Information.

Despite these obligations, Medline has learned that you intend to commence employment with Performance Health, a direct competitor of Medline.  In addition, it is concerning that your departure coincides with the

hiring by Performance Health of two other employees of Medline in your same business area, including your direct manager.

Medline is continuing to investigate this situation and assess its potential course of action. You should be aware that Medline may have claims against you for injunctive relief and damages to the extent it is determined that you have breached your contractual obligations in the Protective Covenant Agreement or violated your statutory and common law duties, including applicable laws relating to the use of Medline's trade secrets and computer systems. To avoid giving rise to further claims by Medline and maintain the status quo, Medline demands that you immediately cease and desist from any ongoing or additional violation of your legal obligations.

In addition, pursuant to Section 4(b) of the Protective Covenants Agreement, on or before May 13, 2025, Medline requests that you provide it with the following information: the nature of your expected duties with Performance Health, the products and services provided by Performance Health for which you will be responsible in your new position, and the geographic area in which you will be working as an employee of Performance Health and for which you will have responsibility. Medline also requests that you state in your response whether you have been involved in any way in soliciting other Medline employees or if, in turn, you have been solicited for employment by any current or former employees of Medline.

Furthermore, pursuant to your obligations in Sections 5 ("Confidential Information") and 11 ("Return of Property, Device Inspection") of the Protective Covenants Agreement and by the same deadline specified above, Medline requests that you complete the declaration attached hereto and return it to Medline. This will confirm that you have returned all Confidential Information and other property of Medline, that you no longer have any such information or property in your possession, including on your personal cell phone, tablet, or computer or in your personal email, and that you have not shared such information with Performance Health.

Your cooperation in providing the information and declaration requested in this letter will be taken into consideration by Medline in assessing whether legal action relating to your hiring by Performance Health will be necessary.

Given the circumstances described above, you are hereby instructed to preserve all emails, voicemails, texts, letters, notes and other information relating to Medline's potential claims, including, but not limited to, all communications relating to your hiring by Performance Health, whether with Performance Health or with any other current or former employees of Medline. Your failure to preserve such information may constitute spoliation of evidence and expose you to civil, and in some cases even criminal, sanctions.

This letter does not constitute a waiver of any of Medline's rights or remedies under the Protective Covenants Agreement or applicable law. All such rights and remedies are expressly reserved.

Sincerely,

Peter F. Donati