**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MEDLINE INDUSTRIES, LP, | ) | |
| | ) | Case No. 25-cv-06153 |
| Plaintiff, | ) | |
| | ) | Hon. John F. Kness |
| v. | ) | |
| | ) | |
| AL AUSIELLO, | ) | |
| | ) | |
| Defendant. | ) | |

**RESPONSE IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING
ORDER AND FOR PRELIMINARY INJUNCTION**

Micah E. Marcus (ARDC No. 6257569)
Jacob D. Radecki (ARD No. 6321345)
Michael P. Croghan (ARDC No. 6312601)
Margaret C. Redshaw (ARDC No. 6327480)
McDonald Hopkins LLC
300 North LaSalle, Suite 1400
Chicago, IL 60654
Telephone: (312) 280-0111
E-mail: mmarcus@mcdonaldhopkins.com
      jradecki@mcdonaldhopkins.com
      mcroghan@mcdonaldhopkins.com
      mredshaw@mcdonaldhopkins.com

*Attorneys for Defendant Al Ausiello*

36305422.2

# TABLE OF CONTENTS

**RELEVANT BACKGROUND** ................................................................................... 2

   I.    AUSIELLO'S EMPLOYMENT WITH MEDLINE .................................. 2

     A.   Ausiello's Role Generally ........................................................... 2

     B.   Ausiello's Role and Responsibilities as Market Sales Director ..................... 3

     C.   Ausiello's Confidentiality and Noncompetition Covenants ........................... 4

   II.   AUSIELLO CEASES HIS EMPLOYMENT WITH MEDLINE AND REPRESENTS THAT ALL MEDLINE INFORMATION IN HIS POSSESSION WAS DELETED ................ 6

   III.   AUSIELLO'S ROLE WITH PERFORMANCE HEALTH ........................... 7

   IV.   AUSIELLO WOULD SUFFER SEVERE HARM FROM AN INJUNCTION AGAINST HIM ................................................................. 8

**LEGAL STANDARD** ........................................................................................ 9

**ARGUMENT** ............................................................................................... 10

   I.    MEDLINE IS UNLIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS ......... 10

     A.   Medline's Trade Secret Claims Fail for Multiple Reasons .............................. 11

       1.   The information Medline alleges Ausiello misappropriated does not constitute trade secrets ........................................................................ 11

         a.   The information is generally known in the industry and easily ascertainable. ..... 12

         b.   Customer pricing and margin information does not constitute a trade secret. ...... 12

         c.   Medline has failed to establish sufficient secrecy and protection. ........................ 13

       2.   The information was not disclosed and will not inevitably be disclosed. ............... 15

         a.   No actual misappropriation occurred. .................................................... 15

         b.   The inevitable disclosure doctrine does not apply. ................................... 16

       3.   Ausiello no longer possesses the allegedly misappropriated information, eliminating any threat. ........................................................................ 17

     B.   Medline's Computer Fraud and Abuse Act Claim Fails Because Ausiello's Alleged Misuse of Authorized Access for an Improper Purpose Cannot Establish a CFAA Claim ... 18

     C.   Medline is Unlikely to Succeed on Its Breach of Contract Claim ............................ 21

       1.   Medline misinterprets Ausiello's noncompetition agreement, which only forbids competition in a narrow geography ............................................................ 22

       2.   As interpreted by Medline, Ausiello's noncompetition covenant is overly broad and unenforceable. ............................................................................. 24

         a.   The noncompetition covenant is far broader than necessary to protect Medline's legitimate interests. ............................................................... 25

         b.   The noncompetition covenant imposes an undue burden on Ausiello. ................ 28

       3.   Ausiello is not violating his obligations under the Agreement ............................. 29

II.     MEDLINE CANNOT ESTABLISH ANY LIKELIHOOD OF IRREPARABLE HARM, AND MEDLINE HAS AN ADEQUATE REMEDY AT LAW IN THE FORM OF MONEY DAMAGES ............................................................................................................. 31

III.    THE BALANCE OF HARMS FAVORS AUSIELLO.................................................... 33

IV.     THE PUBLIC INTEREST DOES NOT FAVOR AN ORDER ENJOINING AUSIELLO FROM WORKING ............................................................................................................. 34

V.    THE COURT SHOULD REQUIRE MEDLINE TO POST A SIGNIFICANT BOND IF IT ENTERS A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION.. 34

**CONCLUSION** ....................................................................................................................... **34**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.J. Dralle, Inc. v. Air Techs., Inc.*,
255 Ill. App. 3d 982 (2d Dist. 1994) ...................................................................13

*ACAS Acquisitions (Precitech) Inc. v. Hobert*,
155 N.H. 381 (2007) ...................................................................26, 27, 28, 29

*Admiin Inc. v. Kohan*,
2023 WL 4625897 (N.D. Ill. July 19, 2023) ...........................................................30

*Aon plc v. Alpine Rewards, LLC*, 2023 WL 3713987, at *8 (N.D. Ill. Apr. 12, 2023) ...................................................................15

*Applied Indus. Materials Corp. v. Brantjes*,
891 F. Supp. 432 (N.D. Ill. Dec. 13, 1994) ...........................................................13

*Behrens v. S.P. Const. Co.*,
153 N.H. 498 (2006) ...................................................................22

*Carbonic Fire Extinguishers, Inc. v. Heath*,
190 Ill. App. 3d 948 (2d Dist. 1989) ...................................................................13

*Chicagoland Aviation, LLC v. Todd*,
2012 WL 5948960 (N.D. Ill. June 8, 2012) ...........................................................13

*Composite Marine Propellers, Inc. v. Van Der Woude*,
962 F.2d 1263 (7th Cir. 1992) (per curiam) ...........................................................11

*Concord Orthopaedics Pro. Ass'n v. Forbes*,
142 N.H. 440 (1997) ...................................................................25, 34

*Contour Design, Inc. v. Chance Mold Steel Co.*,
794 F. Supp. 2d 315 (D.N.H. 2011) ...................................................................11

*Cortez, Inc. v. Doheny Enters., Inc.*,
No., 2017 WL 2958071 (N.D. Ill. July 11, 2017) ...................................................15

*Darryl H. v. Coler*,
801 F.2d 893 (7th Cir. 1986) ...................................................................10

*Delta Med. Sys. v. Mid-Am. Med. Sys., Inc.*,
331 Ill. App. 3d 777 (1st Dist. 2002) ...................................................................12

iii

*DM Trans, LLC v. Scott*,
    38 F.4th 608 (7th Cir. 2022) ................................................................................31

*Doe v. University of Chicago*,
    2022 WL 16744310 (N.D. Ill. Nov. 7, 2022) ........................................................10

*Exhibit Works, Inc. v. Inspired Exhibits, Inc.*,
    2005 WL 3527254 (N.D. Ill. Dec. 21, 2005) ........................................................14

*Found. for Seacoast Health v. Hosp. Corp. of Am.*,
    165 N.H. 168 (2013) ..............................................................................................29

*GEFT Outdoors, LLC v. City of Westfield*,
    922 F.3d 357 (7th Cir. 2019) ...................................................................................9

*Geneva Assur. Syndicate, Inc. v. Med. Emergency Servs. Assocs. (MESA) S.C.*,
    1992 WL 92034 (N.D. Ill. Apr. 29, 1992) ............................................................34

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*,
    549 F.3d 1079 (7th Cir. 2008) .................................................................................9

*Ideal Indus., Inc. v. Gardner Bender, Inc.*,
    612 F.2d 1018 (7th Cir. 1979) ...............................................................................33

*Ill. Republican Party v. Pritzker*,
    973 F.3d 760 (7th Cir. 2020) .................................................................................10

*International Airport Centers, L.L.C. v. Citrin*,
    440 F.3d 418 (7th Cir. 2006) .................................................................................20

*Ixmation, Inc. v. Switch Bulb Co., Inc.*,
    2014 WL 5420273 (N.D. Ill. Oct. 23, 2014) ........................................................33

*Johnson Pub. Co. v. Willitts Designs Int'l, Inc.*,
    1998 WL 341618 (N.D. Ill. June 22, 1998) ..........................................................33

*Keene Auto Body, Inc. v. State Farm Mut. Auto. Ins. Co.*,
    175 N.H. 503 (2022) ..............................................................................................29

*Kinney v. Fed. Sec., Inc.*,
    2001 WL 219691 (N.D. Ill. Mar. 6, 2001) ...........................................................15

*Label Printers v. Pflug*,
    206 Ill. App. 3d 483 (2d Dist. 1991) .....................................................................13

*Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*,
    342 F.3d 714 (7th Cir. 2003) ...........................................................................11, 12

*Life Spine, Inc. v. Aegis Spine, Inc.*,
  8 F.4th 531 (7th Cir. 2021) ...................................................................31

*Mangren Research & Dev. Corp. v. Nat'l Chem. Co.*,
  87 F.3d 937 (7th Cir. 1996) ...................................................................12

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997)................................................................................9

*Mead Johnson & Co. v. Abbott Labs.*,
  209 F.3d 1032 (7th Cir. 2000) ...............................................................34

*Merrimack Valley Wood Prods., Inc. v. Near*,
  152 N.H. 192 (2005)...........................................................22, 24, 25, 28

*Mintel Int'l Grp., Ltd. v. Neergheen*,
  2008 WL 2782818 (N.D. Ill. July 16, 2008).........................................19

*Motorola, Inc. v. Lemko Corp.*,
  609 F. Supp. 2d 760 (N.D. Ill. 2009) ...............................................19, 20

*Orr v. Shicker*,
  953 F.3d 490 (7th Cir. 2020) ...................................................................9

*Pable v. Chicago Transit Authority*,
  615 F. Supp. 3d 842 (N.D. Ill. 2022) ................................................20, 21

*PepsiCo, Inc. v. Redmond*,
  54 F.3d 1262 (7th Cir. 1995) .................................................................30

*Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC*,
  80 F. Supp. 3d 829 (N.D. Ill. 2015) .........................................................9

*SBS Worldwide, Inc. v. Potts*,
  2014 WL 499001 (N.D. Ill. Feb. 7, 2014) .............................................12

*Signal Fin. Holdings LLC v. Looking Glass Fin. LLC*,
  2018 WL 636769 (N.D. Ill. Jan. 31, 2018).............................................11

*Smith v. Office of Civilian Health & Med. Program of Uniformed Servs.*,
  97 F.3d 950 (7th Cir. 1996) ...................................................................34

*Stenstrom Petroleum Servs. Grp., Inc. v. Mesch*,
  375 Ill. App. 3d 1077 (2d Dist. 2007).....................................................13

*Syncom Indus., Inc. v. Wood*,
  155 N.H. 73 (2007) ................................................................................25

v

*Technical Aid Corp. v. Allen*,
134 N.H. 1 (1991) ...................................................................................................25, 29

*Traffic Tech, Inc. v. Kreiter*,
2015 WL 14068877 (N.D. Ill. Sept. 1, 2015) ...........................................................33

*Triumph Packaging Grp. v. Ward*,
834 F. Supp. 2d 796 (N.D. Ill. 2011) ................................................................16, 17

*Valencia v. City of Springfield*,
883 F.3d 959 (7th Cir. 2018) .....................................................................................10

*Van Buren v. United States*,
593 U.S. 374 (2021).................................................................................1, 19, 20, 21

*Vienna Beef, Ltd. v. Red Hot Chicago, Inc.*,
833 F. Supp. 2d 870 (N.D. Ill. 2011) .........................................................................34

*Vill. of Orland Park v. Pritzker*,
475 F. Supp. 3d 866 (N.D. Ill. 2020) .........................................................................33

*Westrock Co. v. Dillon*,
2021 WL 6064038 (N.D. Ill. Dec. 22, 2021) ...........................................................13

**Statutes**

18 U.S.C. § 1030(a)(2)(C) ...................................................................................................18

Computer Fraud and Abuse Act ........................................................................................1, 10

Defend Trade Secrets Act .....................................................................................................11

Illinois Trade Secrets Act......................................................................................................11

New Hampshire Uniform Trade Secrets Act .........................................................................11

**Other Authorities**

Fed. R. Civ. P. 65(c) .............................................................................................................34

Medline does not have *any* viable claims. Medline, which has an adequate remedy at law, does not face *any* threat of irreparable harm. Accordingly, Medline has not met its significant burden to warrant the extraordinary relief of a TRO that threatens to ruin a man's ability to pursue a livelihood. Indeed:

- Medline's trade secret claim fails because: (i) the alleged misappropriated business information does not constitute "trade secrets" as a matter of law; (ii) Medline failed to submit evidence of taking sufficient steps to protect against the information's disclosure; and (iii) the evidence before the Court unequivocally demonstrates that all such information has been deleted and never shared – thus there are no damages, let alone misappropriation;

- As Medline admits that Ausiello had access to the files he forwarded to himself, there is no claim under the Computer Fraud and Abuse Act Claim as a matter of well-settled law. *Van Buren v. United States*, 593 U.S. 374, 388 (2021); and

- Medline's breach of contract claim fails because: (i) Ausiello's covenant not to compete does not provide for a nationwide ban against Ausiello's ability to work for Performance Health; (ii) were Medline's interpretation of a national ban on Ausiello's employment correct (it is not), the agreement would be overbroad, unduly burdensome and unenforceable as a matter of New Hampshire law; and (iii) as it relates to confidentiality, Ausiello has deleted all Medline records – which were never shared with anyone – thus there was no disclosure (let alone threat of future disclosure).

The fatal deficiencies in Medline's underlying claims are dispositive of Medline's requested relief in and of itself, but there is more. The evidence presented to the Court also demonstrates that there is no immediate threat of irreparable harm justifying entry of Medline's requested relief.

First, Medline's potential damages, lost profits or sales opportunities, amount to nothing more than money damages – which does not constitute irreparable harm as a matter of law. Second, Medline's own inaction demonstrates the lack of any emergency or imminent harm of any sort (whether irreparable or not) justifying injunctive relief. To the contrary, Medline admits that it waited approximately a month after being on notice of Ausiello's decision to return to work with

Performance Health before seeking any relief. Its delay speaks volumes as to the lack of any anticipated irreparable harm and this Court can follow well-established precedent and deny Medline's request on this basis alone.

What's more, if the Court had any concern regarding: (i) sharing of Medline's confidential records; or (ii) Ausiello's contacting of clients with whom he worked while at Medline, Ausiello has already offered to voluntarily agree to be precluded from such conduct, whether it be by agreed order or otherwise – indeed, he has no records to share (they have all been deleted) and his new employment was always contemplated to *not* crossover with any of his client work he performed at Medline. The fact that this olive branch has been rebuffed, again, speaks volumes about what this litigation and present motion is about.

In sum, Medline has not justified (nor can it justify) its requested relief of a draconian TRO precluding Ausiello from continuing his employment with Performance Health and Medline's motion should be summarily denied.

## RELEVANT BACKGROUND

From approximately 2004 to 2019, Ausiello was employed by Performance Health, progressing from sales representative to Area Sales Manager/Branch Manager. (Declaration of Al Ausiello in Support of Defendant's Response in Opposition to Motion for Temporary Restraining Order ("Ausiello Decl."), attached as **Exhibit A**, at ¶ 4.) In August 2019, Ausiello left his employment at Performance Health to work for Medline Industries, LP ("Medline"). (*Id.* at ¶ 5.)

## I.     AUSIELLO'S EMPLOYMENT WITH MEDLINE

### A.     Ausiello's Role Generally

Medline is a provider of medical-surgical products and supply chain solutions among a wide range of medical industries. (Ausiello Decl. ¶ 7.) Medline alleges that, in August 2019, Ausiello was hired by Medline as a Sales Specialist Equipment & Furnishings Division. (Compl.

36305422.2

¶ 9.) On August 1, 2022, Ausiello was promoted to Senior Sales Specialist. (*Id.*) On January 1, 2024, Ausiello moved into the position of Product Sales Specialist Advanced. (*Id.*) And on January 1, 2025, Ausiello's title changed to Market Sales Director. (Ausiello Decl. ¶ 11.)

Throughout Ausiello's tenure at Medline, he worked in the acute care, post-acute care, and physician office divisions and managed three product categories: (i) therapy/rehabilitation; (ii) safe patient handling; and (iii) fall prevention. (Ausiello Decl. ¶ 12.) During Ausiello's tenure, the majority of Medline's dollar volume fell within the safe-mobility space. (*Id.*) In Ausiello's Sales Specialist positions, he supported Medline's acute sales team, post-acute, and physician office sales teams Integrated Delivery Network ("IDN") managers, and national account personnel on group purchasing organization ("GPO") projects. (*Id.* at ¶ 13.) He gathered data and maintained information on customers, analyzed product needs, and conducted market research on product offerings, amongst other things. (*Id.*) Importantly, Ausiello's role had a limited client facing component. (*Id.* at ¶ 14.) He was not tied to specific customer accounts and did not own customer relationships. (*Id.*) Rather, Ausiello appeared before customers only when invited by the account-holding salesperson to assist with the preparation and presentation of products or information in connection with opportunities that the salesperson identified. (*Id.* at ¶ 15.)

### B. Ausiello's Role and Responsibilities as Market Sales Director

Although Ausiello's title changed between August 2019 and May 2025 and he moved from all market classes to just acute in 2023, his roles and responsibilities generally remained the same. (Ausiello Decl. ¶ 16.) As Market Sales Director, Ausiello continued to support Medline's acute sales team, IDN managers, and national account personnel on GPO projects larger than Ausiello's prior roles. (Ausiello Decl. ¶ 18.) He oversaw and managed the sales activities of the market, collected data, implemented strategies and policies to meet corporate marketing objectives, among other things. (*Id.*) The role only had a limited client- facing component. (*Id.*) Indeed, as Market

Sales Director, Ausiello worked directly (face-to-face) with only six or seven of Medline's customers in the therapy and rehabilitation category, including Aspirus and Massachusetts General. (*Id.* at ¶ 19.) Those six to seven customers were the only customers which he had significant exposure to in the therapy and rehabilitation category by evaluating customer needs, providing samples, and cross-referencing pricing. (*Id.*)

Because Ausiello was not client-facing nor a Medline salesperson, he was not the primary contact between Medline and any client, including Aspirus. (Ausiello Decl. ¶ 21.) Rather, Paul Pagel was Ausiello's point of contact with Aspirus. (*Id.* at ¶ 22.) All of his communication with Aspirus was at the direction of Pagel. (*Id.*) And he was not involved in determining final pricing for Aspirus. (*Id.*) Ausiello has no knowledge regarding Aspirus's decision to remain with Performance Health—it predated his employment with Performance Health, and he was not involved whatsoever in Performance Health's retention of Aspirus's business. (*Id.* at ¶ 23.)

### C. Ausiello's Confidentiality and Noncompetition Covenants

Medline alleges that, on January 30, 2025, Ausiello entered into a written agreement delineating certain confidentiality and noncompetition obligations. (Compl. Ex. A, the "Agreement".) Medline alleges that Medline as a Market Sales Director for Medline, Ausiello "***had access to*** trade secrets and other highly confidential and proprietary information" (Compl. ¶ 13, emphasis added). In the Agreement, Medline defined "Confidential Information" (in part) as "all information, or a compilation of information, in any form (tangible and intangible), related to [Medline's] Business which (i) [Medline] has not made public or authorized public disclosure of, (ii) is conspicuously marked or otherwise identified as confidential or proprietary, and/or (iii) should reasonably be understood by Salesperson to be confidential based upon the nature of the information." (*Id.* at ¶ 18; Agreement at § 7(a).)

As to his noncompetition covenant, Section 7(b) of the Agreement provides that, for 18 months after Ausiello's employment, he will not:

> i) Participate in, manage, supervise, consult with, or provide services within the ***Restricted Area*** to a Conflicting Business that are the same as or similar in purpose of function to any services Salesperson provided to Medline during the Look Back Period or that are otherwise likely to result in the use or disclosure of Confidential Information;

> (ii) Engage in the manufacture, development, design, or distribution (such as selling or marketing) of any Conflicting Product or Service ***within the Restricted Area***;

> (iii) Own, operate, finance, control, or otherwise hold a material interest in a Conflicting Business; provided, however, that nothing herein shall prohibit Salesperson from owning 5% or less of the publicly traded stock of a Conflicting Business so long as such ownership is a noncontrolling interest, passive in nature (such as through a mutual fund), and Salesperson has no other material involvement with the Conflicting Business of any kind, ***within the Restricted Area***; [or]

> (iv) Undertake any preparations or preliminary actions to engage in any of the activities prohibited under subsections (i) through (iii) above.

(Agreement at § 7(b), emphasis added.) The Agreement defines "Restricted Area" as:

> (i) Salesperson's geographic territory or territories during the Look Back Period, ***if Salesperson has a geography-based Territory***; (ii) a radius of 100 miles surrounding the Salesperson's primary residence or any of the location(s) of Salesperson's customers, ***if Salesperson has a customer-based Territory***; or (iii) a radius of 50 miles surrounding each office, facility, or location of Medline that Salesperson works out of or has supervisory or management authority over during the Look Back Period, if neither (i) or (ii) applies.

(Agreement at § 3(j), emphasis added.) And the term "Territory" is expressly defined as "accounts or geographic locations ***identified or assigned to Salesperson from time to time in writing*** by Medline." (*Id.* at § 3(l), emphasis added.) However, when Ausiello became Market Sales Director, he does not recall receiving a written identification or assignment of accounts or geography. (Ausiello Decl. ¶ 17.) Moreover, Ausiello did not have any direct reports while Market Sales Director at Medline, and was not the manager or supervisor for any employees. (*Id.* at ¶ 24.)

The Agreement also contains an integration clause providing that it is "the entire agreement between Salesperson and Medline relating to the subject matter of this Agreement [*i.e.*, Ausiello's

noncompetition and other restrictive covenants] and supersedes all prior agreements and understandings, whether written or oral." (Agreement at § 23.)

## II. AUSIELLO CEASES HIS EMPLOYMENT WITH MEDLINE AND REPRESENTS THAT ALL MEDLINE INFORMATION IN HIS POSSESSION WAS DELETED

Medline alleges that, prior to his departure, Ausiello "sent trade secrets and/or confidential and proprietary information to his personal email" on at least five occasions. (Compl. ¶ 47.) This information included Excel spreadsheets containing data from Medline's Data Analytics Research Tool ("DART") (*id.* at ¶ 49); general customer information (*id.* at ¶ 50, 52); and information about products purchased by a certain customer, Aspirus (*id.* at ¶ 51, 54). In connection with Ausiello's work for Medline, he was authorized to access Medline's computer networks and systems, including DART. (Ausiello Decl. ¶ 47.) Ausiello was also given the ability by Medline to access all information set forth in any Medline documents sent to his personal email account. (*Id.*)

Ausiello's last day with Medline was on May 7, 2025. (Ausiello Decl. ¶ 25.) Thereafter, Ausiello permanently deleted all Medline emails and files from his personal laptop, email account, and devices. (*Id.* at ¶ 26.) On May 19, 2025, at the request of Medline's counsel, Ausiello executed a written certification, consistent with Section 11 of Medline's Protective Covenants Agreement, regarding the return of all Medline property and deletion or destruction of all Medline information in Ausiello's possession. (Ausiello Decl. ¶ 27, Ex. 1.) Ausiello performed a search of his personal computer and devices to make sure that all Medline information and data had been destroyed and/or deleted. (*Id.*) To the best of Ausiello's knowledge, all Medline information and data that was in Ausiello's possession at the conclusion of his employment with Medline has been destroyed and/or deleted. (*Id.* at ¶ 29.) And to the extent he sent any Medline information to his personal email, it was never shared with Performance Health or any other third party and has since been deleted or destroyed at the request of Medline's counsel. (*Id.* at ¶ 45.) To be clear, Ausiello never

36305422.2

provided the information in any document to Performance Health or any other third party. (*Id.* at ¶ 46.)

To the best of Ausiello's knowledge, at present he does not possess, on any device or cloud account, any Medline property or Confidential Information. (Ausiello Decl. ¶ 48.) And he does not remember the data specifically reflected in the Medline documents, including specific client pricing, sent to his personal email. (*Id.* at ¶ 49.)

## III.    AUSIELLO'S ROLE WITH PERFORMANCE HEALTH

On May 19, 2025, Ausiello began his new employment as a National Accounts Executive with Performance Health. (Ausiello Decl. ¶ 30.) On May 22, 2025, Ausiello executed an Asset Protection Agreement with Performance Health. (*Id.* at ¶ 30; Ex. 2.) In the Asset Protection Agreement, Ausiello agreed not to use or disclose any trade secrets or other confidential information of Medline in the course of his employment with Performance Health. (*Id.* at ¶ 30; Ex. 2 at § 3.)

In Ausiello's role as National Accounts Executive, he works directly with GPOs and IDNs [integrated delivery networks] that purchase through those GPOs. (Ausiello Decl. ¶ 31.) Performance Health's primary business is in the therapy/rehab category. (*Id.* at ¶ 32.) Performance Health has limited sales of safe-patient-handling or safe-mobility products—product lines Ausiello managed at Medline. (*Id.*) And Ausiello's superiors at Performance Health have repeatedly confirmed that he will not be placed on the Aspirus or Massachusetts General accounts, (*id.* at ¶ 33; ¶ 39), the accounts Medline identifies as of concern in its Complaint.

The overlap between Ausiello's roles at Medline and Performance Health is insignificant. (Ausiello Decl. ¶ 34.) Medline operates on a project-based, price-negotiated model in the acute care space. (*Id.* at ¶ 35.) And in the Rehab/Fall Prevention Division that Ausiello worked in, Medline derives substantial revenue from fall prevention and safe patient-handling equipment—

7

areas in which Performance Health has minimal participation. (*Id.*) Additionally, Medline is not on national GPO contracts for its products in the Therapy and Rehab Category. (*Id.* at ¶ 36.) Instead, Medline prices items where Medline felt it would be competitive, and the acute sales team and Medline's pricing team and analyst would determine if it was acceptable. (*Id.*) The acute sales force determines pricing on a case-by-case basis. (*Id.*)

In contrast, Performance Health already holds multi-year contracts with the major GPOs. (Ausiello Decl. ¶ 37.) Pricing is initially fixed at the contract level, and it is ordinarily negotiated by Performance Health's dedicated pricing team, not by its salespeople. (*Id.*) Ausiello's understanding is that salespeople in Performance Health's national accounts division—his new role—are able to propose local agreements with customers, but the pricing team must approve any pricing that is lower than the contract prices. (*Id.*) Rather than setting or adjusting prices, Ausiello's responsibilities center on contract administration and relationship management. (*Id.*)

Moreover, at Medline Ausiello was "one step removed" from GPOs and IDNs—he was never client-facing unless specifically brought in by the account director for a limited purpose, such as presentations. (Ausiello at ¶ 38.) Conversely, at Performance Health, Ausiello will be interfacing directly with customers regarding a different business model and product scope. (*Id.* at ¶ 39.) And to Ausiello's knowledge, he has not (and will not) be assigned to accounts he worked with at Medline in the therapy/rehab category as Market Sales Director. (*Id.* at ¶ 40.)

## IV.    AUSIELLO WOULD SUFFER SEVERE HARM FROM AN INJUNCTION AGAINST HIM

Since resigning from Medline, Ausiello has not solicited any Medline customer, prospect, or employee. (Ausiello Decl. ¶ 51.) He has not used, and will not use, any Medline confidential information in his work for Performance Health. (*Id.*) If the Court were to restrain him from performing his national-account duties at Performance Health, he would lose his livelihood. (*Id.*

at ¶ 54.) He is currently going through a divorce, live alone, and is solely responsible for his living expenses. (*Id.*)

## LEGAL STANDARD

A temporary restraining order or a preliminary injunction is "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020) (quoting *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008)). And to obtain such drastic relief, the party seeking the relief—here, Medline—carries the burden of persuasion by a clear showing. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

To obtain a TRO, a movant must demonstrate: (1) a likelihood of success on the merits; (2) that it has no adequate remedy at law; and (3) that it will suffer irreparable harm if the relief is not granted. *See Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC,* 80 F. Supp. 3d 829, 833 (N.D. Ill. 2015) (citing *Smith v. Executive Dir. Of Ind. War. Mem'ls Comm'n*, 742 F. 3d 282, 286 (7th Cir. 2014)). If the moving party satisfies each of these requirements, the court "must weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction[.]" *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (quoting *Planned Parenthood, of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 896 F.3d 809, 816 (7th Cir. 2018)). "Specifically, the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S.A., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008) (citing *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11–12 (7th Cir. 1992)).

The Court then weighs these factors in what the Seventh Circuit has called a "sliding scale" approach. That is, "[t]he more likely the plaintiff is to win, the less heavily need the balance of

harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018) (internal quotation marks omitted). And "[w]here appropriate, this balancing process should also encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the 'public interest')." *Id.*

In resolving a motion for TRO, the Court reviews the record from a "neutral and objective viewpoint" without accepting the Plaintiff's allegations as true, nor drawing reasonable inferences in Plaintiff's favor. *Doe v. University of Chicago*, 2022 WL 16744310, at *2 (N.D. Ill. Nov. 7, 2022) (citing *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791-792 (7th Cir. 2022)). The Court must "make factual determinations on the basis of a fair interpretation of the evidence before the court" at this stage. *Darryl H. v. Coler*, 801 F.2d 893, 898 (7th Cir. 1986).

## ARGUMENT

## I.      MEDLINE IS UNLIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS

The first factor—"likelihood of success on the merits"—requires the plaintiff to make a "strong showing that she is likely to succeed on the merits" of her claim; a mere "possibility of success is not enough" to warrant emergency relief. *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). This showing requires the plaintiff to provide facts and legal theories supporting "the key elements of its case." *Id.* at 763. Medline's request for injunctive relief should be denied because Medline cannot make a strong showing that it is likely to succeed on the merits of its trade secrets, Computer Fraud and Abuse Act, or breach of contract claims.[1]

---

[1] Medline does not appear to base its request for an injunction on its claim that Ausiello breached his alleged duty of loyalty. In all events, Medline is unlikely to succeed on this claim, too, because he deleted all information sent to his personal email and did not disseminate that information to anyone at Performance Health.

A.     **Medline's Trade Secret Claims Fail for Multiple Reasons**

Medline brings claims under the Defend Trade Secrets Act ("DTSA"), the Illinois Trade Secrets Act ("ITSA"), and the New Hampshire Uniform Trade Secrets Act ("NHTSA"). Medline failed to meet its burden of establishing likelihood of success on the merits of its trade secret claims because the allegedly misappropriated information does not qualify as a trade secret and was not disclosed to a competitor. The information was never disclosed to Performance Health and has been subsequently destroyed, eliminating any threatened misappropriation.

1.     **The information Medline alleges Ausiello misappropriated does not constitute trade secrets.**

"The definitions of 'trade secret' [is] substantially similar" under the ITSA and the DTSA. *See Signal Fin. Holdings LLC v. Looking Glass Fin. LLC*, 2018 WL 636769, at *3 (N.D. Ill. Jan. 31, 2018). The definition of trade secret is substantially similar under the NHTSA as well. *See Contour Design, Inc. v. Chance Mold Steel Co.*, 794 F. Supp. 2d 315, 322 (D.N.H. 2011). "[A] trade secret 'is one of the most elusive and difficult concepts in the law to define.'" *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003). "It is not enough to point to broad areas of [information] and assert that something there must have been secret and misappropriated. The plaintiff must show concrete secrets." *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992) (per curiam).

In making this evaluation, Illinois courts refer to six factors in deciding whether a trade secret exists: (1) the extent to which the information is known outside of the plaintiff's business; (2) the extent to which the information is known by employees and others involved in the plaintiff's business; (3) the extent of measures taken by the plaintiff to guard the secrecy of the information; (4) the value of the information to the plaintiff's business and to its competitors; (5) the amount of time, effort and money expended by the plaintiff in developing the information; and (6) the ease

11

or difficulty with which the information could be properly acquired or duplicated by others. *Learning Curve Toys*, 342 F.3d at 722.

### a. The information is generally known in the industry and easily ascertainable.

The first statutory requirement under ITSA "precludes trade secret protection for information generally known within an industry even if not to the public at large." *Mangren Research & Dev. Corp. v. Nat'l Chem. Co.*, 87 F.3d 937, 942 (7th Cir. 1996). Medline alleges that Ausiello misappropriated trade secrets in the form of a spreadsheet containing the names of IDNs, the names of IDN directors, group purchasing organization affiliations, and other unidentified information about the IDNs. Medline itself acknowledges that "much of this information might be publicly available" (Compl. ¶ 50), undermining any claim of secrecy for this customer identity information. General unavailability however is not the only requirement for a trade secret. "Where information can be readily duplicated without involving considerable time, effort or expense, it is not a trade secret." *Delta Med. Sys. v. Mid-Am. Med. Sys., Inc.*, 331 Ill. App. 3d 777, 791 (1st Dist. 2002). The complaint asserts without any detail and in conclusory fashion that the information was created at "substantial time" and "significant expense" (Compl. ¶ 56, 76, 98.) The record contains no facts regarding the time, effort, or expense that would be necessary to duplicate the information. Medline has therefore failed to meet its burden to establish this information is a trade secret.

### b. Customer pricing and margin information does not constitute a trade secret.

Medline alleges that Ausiello misappropriated customer pricing information. (Compl. ¶ 49, 52.) Medline's customer pricing information is also not a trade secret. "[P]rice information which is disclosed by a business to any of its customers, unlike a unique formula used to calculate the price information which is not disclosed to a business's customers, does not constitute trade secret information protected by the [ITSA]." *See SBS Worldwide, Inc. v. Potts*, 2014 WL 499001, at *4

(N.D. Ill. Feb. 7, 2014) (internal quotation marks omitted); *see also Applied Indus. Materials Corp. v. Brantjes*, 891 F. Supp. 432, 437-38 (N.D. Ill. Dec. 13, 1994) (trade secret protection denied to pricing information); *see also Westrock Co. v. Dillon,* 2021 WL 6064038, at *9-10 (N.D. Ill. Dec. 22, 2021) (same); *see also A.J. Dralle, Inc. v. Air Techs., Inc.,* 255 Ill. App. 3d 982, 994 (2d Dist. 1994) (pricing information not confidential); *see also Label Printers v. Pflug,* 206 Ill. App. 3d 483, 496 (2d Dist. 1991) (same); *see also Carbonic Fire Extinguishers, Inc. v. Heath,* 190 Ill. App. 3d 948, 953-954 (2d Dist. 1989) (reversing entry of preliminary injunction because pricing information neither a trade secret nor confidential information). Absent a confidentiality agreement with its customers, which is not in the record, pricing information disclosed to a customer does not constitute a trade secret.

Medline also alleges that Ausiello misappropriated profit margin information (Compl. ¶ 49, 52), but even that is not enough. Courts have held profit margin is not a trade secret. *See Chicagoland Aviation, LLC v. Todd,* 2012 WL 5948960, at *6 (N.D. Ill. June 8, 2012) (denying confidential status to spreadsheet outlining "costs and profit margin" because the information was ascertainable through "experience" and "making inquiries"); *see also Stenstrom Petroleum Servs. Grp., Inc. v. Mesch,* 375 Ill. App. 3d 1077, 1093 (2d Dist. 2007) (rejecting plaintiff's "argument that its profit margin is a trade secret").

### c. *Medline has failed to establish sufficient secrecy and protection.*

The record reveals several failures in maintaining secrecy. Medline alleges that it took sufficient steps to protect its information, such as by requiring employees to sign confidentiality agreements (Compl. ¶ 30) and protecting access to information through computer passwords (*Id.* at ¶ 31). Medline alleges that the information Ausiello sent himself consisted of spreadsheets "apparently" pulled from Medline's Data Analytics Research Tool ("DART") and that DART is only available to employees at Medline with a "business-need" to use such data (Compl. ¶ 49), but

13

it stops short of alleging (or providing evidence) that the information Ausiello alleged misappropriated was in fact pulled from DART. Medline also fails to allege or provide evidence about how many or which of its employees have a "business need" to access DART, giving the Court no basis to conclude that Medline has in fact restricted access to this information in any meaningful way.

Courts faced with similar circumstances have denied trade secret status to business information electronically available to employees. In *Exhibit Works, Inc. v. Inspired Exhibits, Inc.*, 2005 WL 3527254, at *8 (N.D. Ill. Dec. 21, 2005), an alleged trade secret owner was denied a preliminary injunction because it failed to demonstrate that it took reasonable steps to protect the information's secrecy. Although the owner argued that it had protected the information with a confidentiality agreement and computer passwords (like Medline did here), the court reasoned that these steps were no more than what the company did to protect all of its information. The court explained that, because "[t]rade secrets are a subset of a company's overall information," reasonable steps to protect their secrecy could only be steps that are "beyond those taken for all of [the company's] business information."

Here, Ausiello had routine access to databases containing nearly 100,000 rows of supposedly trade secret information. (Compl. ¶ 52.) As Mr. Ausiello explains, he was authorized to access Medline's computer networks and systems, including DART, and was given the ability by Medline to access all information set forth in any Medline documents sent to his personal email account. (Ausiello Decl. ¶ 47-48.) The DART system appears to be a routine business database accessible to many Medline employees (Compl. ¶ 49), contradicting the extraordinary secrecy measures typically required for trade secret protection. Medline has failed to meet its burden to establish secrecy and protection of the alleged trade secrets.

14

2. **The information was not disclosed and will not inevitably be disclosed.**

   a. *No actual misappropriation occurred.*

Here, Mr. Ausiello's sworn declaration establishes that he does not "possess, on any device or cloud account, any Medline property or Confidential Information." (Ausiello Decl. ¶ 48.) Nor does he "remember the data specifically reflected in the Medline documents . . . sent to [his] personal email." (*Id*. at ¶ 49.) Since his resignation from Medline, Ausiello has "not solicited any Medline customer, prospect, or employee." (*Id*. at ¶ 51.) And as it relates to Aspirus, the only purported evidence of use of Medline's information, Ausiello had "no knowledge regarding Aspirus's decision to remain with Performance Health" which he had no involvement with whatsoever and predated his employment with Performance Health. (*Id*. at ¶ 23.)

There is no evidence that Ausiello actually used information about Aspirus against Medline. Medline's main allegation regarding Aspirus is on information and belief: "On information and belief and based on the timing of Aspirus' abrupt change in direction and the explanation provided to MEDLINE, AUSIELLO was either directly or indirectly responsible for Aspirus' decision to remain with Performance Health." (Compl. ¶ 65.) Such conclusory allegation "upon information and belief" is insufficient to meet Medline's burden of proof as a matter of law. *See Aon plc v. Alpine Rewards, LLC*, 2023 WL 3713987, at *8 (N.D. Ill. Apr. 12, 2023) (denying TRO where plaintiff only alleged upon information and belief that former employees were directly or indirectly involved in the solicitation of plaintiff's clients); *see also Kinney v. Fed. Sec., Inc.*, 2001 WL 219691, at *1 (N.D. Ill. Mar. 6, 2001) (denying TRO after finding factual assertions are based on "information and belief" lack probative value on TRO issues).

Ausiello simply has "never provided the information in any document [sent to his personal email] to Performance Health or any other third party." (Ausiello Decl. ¶ 46.) Injunctive relief should be denied under these circumstances. *See Cortez, Inc. v. Doheny Enters., Inc.*, No., 2017

WL 2958071, at *10 (N.D. Ill. July 11, 2017) (denying injunctive relief where departing employee did not take any physical documents with him when leaving a prior employer, could not remember specific pricing information, could not remember specific data included in voluminous reports, was not involved in allegedly improper customer solicitation, and never told his new employer information pertaining to former employer's pricing).

<em><strong>b. The inevitable disclosure doctrine does not apply.</strong></em>

Even if Ausiello possessed Medline's trade secrets, which he does not, they will not be inevitably disclosed in his new role. The employer must demonstrate a "high probability" that the former employee will inevitably use trade secrets. *Triumph Packaging Grp. v. Ward*, 834 F. Supp. 2d 796, 809 (N.D. Ill. 2011). Courts in this district consider the following factors when analyzing inevitable disclosure: "(1) the level of competition between the former employer and the new employer; (2) whether the employee's position with the new employer is comparable to the position he held with the former employer; and (3) the actions that the new employer has taken to prevent the former employee from using or disclosing trade secrets of the former employer." *Id*. Here, the analysis of these factors demonstrates no inevitable disclosure.

First, the level of competition between Performance Health and Medline is insignificant. While both companies operate in healthcare supply, "Performance Health's primary business is in the therapy/rehab category. Performance Health has limited sales of safe-patient-handling or safe-mobility products—product lines [Ausiello] managed at Medline." (Ausiello Decl. ¶ 32.) Second, Ausiello's position with Performance Health is different than his position at Medline. "The overlap between my roles at Medline and Performance Health is insignificant." (*Id*. ¶ 34.) At Medline, Ausiello was "one step removed" from customers and generally not client-facing (*Id*. ¶ 38), while at Performance Health, he "will be interfacing directly with customers regarding a different business model and product scope." (*Id*. ¶ 39.) Critically, Ausiello's responsibilities at Performance

16

Health "center on contract administration and relationship management, not on setting or adjusting prices," which in all events must be approved by Performance Health's pricing team. (*Id.* ¶ 37.) Third, Ausiello's new employer, Performance Health, has taken several measures to protect Medline's confidential information. For example, Ausiello and Performance Health entered into an Asset Protection Agreement in which Ausiello agreed "not to use or disclose the trade secrets and other confidential information of a prior employer" in the course of his employment with Performance Health. (*Id.* ¶ 39; Ex. 2.) Performance Health has also taken specific protective measures to prevent Ausiello from using or disclosing Medline's information: Ausiello "will not be placed on the Aspirus or Massachusetts General accounts." (*Id.* ¶ 33.)

Courts are "cautious" in applying the inevitable disclosure doctrine, recognizing that "a broad application would be an effective bar against employees taking similar positions with competitive entities." *Triumph Packaging Grp. v. Ward*, 834 F. Supp. 2d at 809. Medline cannot demonstrate the requisite "high probability" of inevitable disclosure given these substantial differences in business models, roles, and protective measures. *Id.*

### 3. Ausiello no longer possesses the allegedly misappropriated information, eliminating any threat.

Although it is enough that the information Medline seeks to protect are not actually trade secrets and that the information was not disclosed, Mr. Ausiello's declaration also establishes that no information remains in his possession. After leaving Medline, Ausiello "permanently deleted all Medline emails and files from [his] personal laptop, email account, and devices." (Ausiello Decl. ¶ 26.) "On May 20, 2025, at the request of Medline's counsel, [he] executed a written certification, consistent with Section 11 of Medline's Protective Covenants Agreement, affirming that [he] had returned all Medline property and deleted or destroyed all Medline information in [his] possession." (*Id.* ¶ 27.) Ausiello "searched all hard copy files and [his] devices and destroyed

all property belonging to Medline," confirming that he no longer has "any property belonging to Medline or any Confidential Information," and he has "not provided any Confidential Information to Performance Health or any other third party." (*Id.* ¶ 28.) The evidence establishes that Ausiello no longer possesses the information Medline alleges he misappropriated.

   \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

Medline has failed to establish that the information at issue constitutes protectable trade secrets under Illinois law. The alleged "secrets" are either publicly available, readily ascertainable through proper means, or represent standard business information common throughout the healthcare supply industry. Moreover, Ausiello's complete destruction of all materials and sworn certification eliminates any threat of misappropriation. The fundamental differences between Medline's and Performance Health's business models, product lines, and pricing structures further negate any claim of competitive harm. Medline is unlikely to succeed on the merits of its trade secrets claims.

**B.**    **Medline's Computer Fraud and Abuse Act Claim Fails Because Ausiello's Alleged Misuse of Authorized Access for an Improper Purpose Cannot Establish a CFAA Claim**

Under the CFAA, an individual is liable where he "intentionally accesses a computer without authorization or exceeds authorized access[] and thereby obtains . . . information from any protected computer." 18 U.S.C. § 1030(a)(2)(C). Medline claims that, as a Market Sales Director for Medline, Ausiello "*had access to* trade secrets and other highly confidential and proprietary information" (Compl. ¶ 13, emphasis added) under guidelines to use that information solely for Medline's benefit (*id.* at ¶ 32-39) and that he violated the CFAA by intentionally accessing a Medline computer "without authorization or by exceeding authorized access to such computer . . . . (*Id.* at ¶ 89.). Medline's theory of liability under the CFAA is barred by Supreme Court precedent.

In *Van Buren v. United States*, 593 U.S. 374, 388 (2021), the Supreme Court considered whether a defendant-appellant, a police officer who used his patrol-car computer to access a law enforcement database and perform a license plate search in exchange for money, had "exceeded authorized access" within the meaning of the CFAA. In The Supreme Court held that he had not, expressly holding that the phrase "exceeds authorized access" means "the act of entering a part of the system to which a computer user lacks access privileges." *Van Buren v. United States*, 593 U.S. 374, 388 (2021). In so holding, the Supreme Court discussed both the "exceeds authorized access" clause *and* the "without authorization" clause, endorsing the appellant's view that the "'without authorization' clause . . . protects computers themselves by targeting so-called outside hackers— those who 'acces[s] a computer without any permission at all'" while the "exceeds authorized access" clause "target[s] so-called inside hackers—those who access a computer with permission, but then "'exceed' the parameters of authorized access by entering an area of the computer to which [that] authorization does not extend." *Van Buren*, 593 U.S. at 389-390 (citing *United States v. Valle*, 807 F.3d 508, 524 (2d Cir. 2015)). The Supreme Court held that "liability under both clauses stems from a gates-up-or-down inquiry—one either can or cannot access a computer system, and one either can or cannot access certain areas within the system. And reading both clauses to adopt a gates-up-or-down approach aligns with the computer-context understanding of access as entry." *Van Buren*, 593 U.S. at 390.

In light of *Van Buren*, Medline's reliance (at 18-19) on *Motorola, Inc. v. Lemko Corp.*, 609 F. Supp. 2d 760, 767 (N.D. Ill. 2009) and *Mintel Int'l Grp., Ltd. v. Neergheen*, 2008 WL 2782818, at *3 (N.D. Ill. July 16, 2008) is particularly inappropriate. The *Motorola* court's holding (and reliance on *Mintel*) that "[a]llegations that an employee e-mailed and downloaded confidential information for an improper purpose are sufficient to state a claim that the employee exceeded her

authorization" has been overruled by *Van Buren*. Indeed, in rejecting the broad view of "exceeds authorized access," the Supreme Court in *Van Buren* disagreed with *International Airport Centers, L.L.C. v. Citrin*, 440 F.3d 418 (7th Cir. 2006)—the case upon which *Motorola* (and thus Medline) relies for the incorrect proposition that "an employee who breaches her duty of loyalty to an employer or acquires an adverse interest to her employer is no longer authorized to access the employer's computers." (*Compare* Mot. at 18 *with Citrin*, 440 F.3d at 421.)

The court in *Pable v. Chicago Transit Authority*, 615 F. Supp. 3d 842, 845 (N.D. Ill. 2022), rejected the very theory Medline advances here. In *Pable*, a former computer programmer and analyst for the CTA sued on the grounds that he was wrongfully terminated for publicly reporting a flaw in the CTA's BusTime application for providing alerts and service information to public transit users. *Id.* at 842. The CTA filed a counterclaim alleging that Pable violated the CFAA "by obtaining unauthorized control over the BusTime application and by encrypting his work computer without CTA's knowledge or approval . . . without authorization and/or by exceeding authorized access." *Id.* at 844. In trying to distinguish *Van Buren*, the CTA argued that the "scope of access to the device" was different such that although "it gave Pable access . . . its grant of access did not include authorization to either unilaterally encrypt the [a computer drive], or unilaterally install and encrypt [a second drive], *for any purpose*." *Id.* at 845 (emphasis in original). In rejecting the CTA's argument, the *Pable* court concluded that "*Van Buren*'s essential holding is that determining whether a user's conduct violates the CFAA requires a 'gates-up-or-down inquiry—one either can or cannot access a computer system, and one either can or cannot access certain areas within the system.'" *Id.* at 845 (quoting *Van Buren*, 593 U.S. at 374). The *Pable* court concluded that "[t]he CTA does not allege that the gates were 'down' to Pable with respect to any area of its computer system. Instead, it alleges that he accessed the system through gates that were 'up' to him, and that

once inside, he took actions prohibited by the CTA's "rules, regulations, and policies." That claim falls squarely within *Van Buren's* purview." *Pable*, 615 F.Supp.3d at 845.

The same is true here. Medline does not allege that Ausiello accessed any of Medline's information with the "gate down" such that he can be held liable under the CFAA. Indeed, Medline expressly alleges the opposite—that it gave Ausiello access to confidential and proprietary information (Compl. ¶ 13) which he then sent to himself for personal or competitive use. (Compl. ¶ 47, 49, 50-52, 54.) These are the same supposed violations of the CFAA that *Van Buren* and *Pable* expressly rejected. Thus, Medline has no likelihood of success on its CFAA claim.

### C.    Medline is Unlikely to Succeed on Its Breach of Contract Claim

Medline asks this Court to endorse a sweeping interpretation of the restrictive covenants contained in the Agreement. Medline baldly claims that Ausiello's "prior territory as Market Sales Director covered the entire United States, so this is the restricted Area for purposes of the Protective Agreement." (Memo. at 24.) From there, Medline argues that this Court should award it a nationwide injunction that prevents Ausiello from working for Performance Health. (Mot. at 2, ¶ (2). The problem with Medline's theory is threefold: *first*, Medline failed to assign Ausiello any "Territory" as that term is defined in the Agreement—nationally or otherwise—meaning he cannot be restrained from working for Performance Health. *Second*, to the extent this Court concurs with Medline's sweeping interpretation of Ausiello's noncompetition agreement (and it should not), Medline's interpretation is overly broad and thus unenforceable under New Hampshire law. And *third*, Ausiello is not working for Performance Health on behalf of any customer located in the 50 miles surrounding his home, *i.e.*, the properly defined Restricted Area under the Agreement. Finally, Medline is similarly unlikely to succeed on its claim for breach of Ausiello's confidentiality obligations because it has no damages—Ausiello has deleted the information

21

Medline claims he took and has not shared it with anyone at Performance Health. We address each in turn.

### 1. Medline misinterprets Ausiello's noncompetition agreement, which only forbids competition in a narrow geography.

Medline asks this Court to bar Ausiello from working for Performance Health nationally in the sale of rehabilitation products, (Compl. at 26, ¶ A(b)), but Medline's request does not comport with any reading—much less a narrow construction—of the text of his noncompetition obligation. "[T]he law does not look with favor upon contracts in restraint of trade or competition." *Merrimack Valley Wood Prods., Inc. v. Near*, 152 N.H. 192, 197 (2005) (citing *Technical Aid Corp. v. Allen,* 134 N.H. 1, 8 (1991)). For that reason, "[s]uch contracts are to be narrowly construed." *Merrimack*, 152 N.H. at 197. Further, "[t]hough not dispositive, an integration clause is evidence that parties intended a writing to be a total integration" containing all terms of the parties' agreement. *Behrens v. S.P. Const. Co.*, 153 N.H. 498, 504 (2006).

In its Motion, Medline glosses over the text of Ausiello's noncompetition covenant, likely because it is fatal to Medline's request. Section 7(b) of the Agreement provides that, for 18 months after Ausiello's employment, he will not:

> i) Participate in, manage, supervise, consult with, or provide services within the ***Restricted Area*** to a Conflicting Business that are the same as or similar in purpose of function to any services Salesperson provided to Medline during the Look Back Period or that are otherwise likely to result in the use or disclosure of Confidential Information;
>
> (ii) Engage in the manufacture, development, design, or distribution (such as selling or marketing) of any Conflicting Product or Service ***within the Restricted Area***;
>
> (iii) Own, operate, finance, control, or otherwise hold a material interest in a Conflicting Business; provided, however, that nothing herein shall prohibit Salesperson from owning 5% or less of the publicly traded stock of a Conflicting Business so long as such ownership is a noncontrolling interest, passive in nature (such as through a mutual fund), and Salesperson has no other material involvement with the Conflicting Business of any kind, ***within the Restricted Area***; [or]

(iv) Undertake any preparations or preliminary actions to engage in any of the activities prohibited under subsections (i) through (iii) above.

(Agreement at § 7(b), emphasis added.) The Agreement defines "Restricted Area" as:

(i) Salesperson's geographic territory or territories during the Look Back Period, *if Salesperson has a geography-based Territory*; (ii) a radius of 100 miles surrounding the Salesperson's primary residence or any of the location(s) of Salesperson's customers, *if Salesperson has a customer-based Territory*; or (iii) a radius of 50 miles surrounding each office, facility, or location of Medline that Salesperson works out of or has supervisory or management authority over during the Look Back Period, if neither (i) or (ii) applies.

(Agreement at § 3(j), emphasis added.) And the term "Territory" is expressly defined as "accounts or geographic locations *identified or assigned to Salesperson from time to time in writing* by Medline." (*Id.* at § 3(l), emphasis added.) Finally, the Agreement also contains an integration clause providing that it is "the entire agreement between Salesperson and Medline relating to the subject matter of this Agreement [*i.e.*, Ausiello's noncompetition and other restrictive covenants] and supersedes all prior agreements and understandings, whether written or oral." (Agreement at § 23.)

Medline's interpretation of Ausiello's noncompetition covenant as applying nationally fails on the covenant's written terms. The sole statement in the Complaint regarding Ausiello's supposed "territory" is Medline's suggestion that "[g]iven that AUSIELLO worked with IDNs on a nationwide basis, the Restricted Area for purposes of his [] Agreement is the United States." (Compl. ¶ 24.) But that conclusory statement ignores the Agreement's requirement that Ausiello be notified in writing of his assigned geography or accounts. Critically, the Complaint does not allege that Medline ever assigned or identified any specific accounts or geographic locations to Ausiello, in writing or otherwise. Nor was that the case as a matter of fact— when Ausiello became Market Sales Director, he does not recall receiving a written identification or assignment of accounts or geography. (Ausiello Decl. ¶ 17.) Moreover, Ausiello did not have any direct reports while Market Sales Director at Medline and was not the manager or supervisor for any employees.

23

(*Id.* at ¶ 24.) Instead, he served as an ad-hoc resource to assist Medline's sales representatives in various geographies and on select accounts. (*Id.* at ¶ 18-21.)

Given that Ausiello was never given a "Territory" within the meaning of his Agreement, the definition of Restricted Area takes the meaning given by Section 3(j)(iii): "a radius of 50 miles surrounding each office, facility, or location that [Ausiello] works out of or has supervisory or management authority over . . . ." Since Ausiello worked out of his Nashua, New Hampshire home (Compl. ¶ 9) and had no direct reports and was not a supervisor or manager, (Ausiello Decl. ¶ 24), his noncompetition covenant maximally applies to the 50-mile radius surrounding his home. This interpretation of Ausiello's noncompetition obligations—unlike Medline's—gives meaning to the expressly defined terms of the parties' integrated Agreement and comports with New Hampshire's narrow construction of noncompetition agreements. For these reasons, this Court should reject Medline's overly broad and aspirational reading of the Agreement.

> **2.      As interpreted by Medline, Ausiello's noncompetition covenant is overly broad and unenforceable.**

To the extent this Court agrees with Medline's interpretation of the noncompetition covenant as a nationwide prohibition on competition (and even if Medline had assigned him in writing to a nationwide Territory), the noncompetition covenant is overly broad and unenforceable under New Hampshire law. "To determine the reasonableness of a restrictive covenant ancillary to an employment contract, [New Hampshire courts] employ a three-pronged test: first, whether the restriction is greater than necessary to protect the legitimate interests of the employer; second, whether the restriction imposes an undue hardship upon the employee; and third, whether the restriction is injurious to the public interest. *Merrimack*, 152 N.H. at 197. "If any of these questions is answered in the affirmative, the restriction in question is unreasonable and unenforceable." *Id.* Medline's noncompetition covenant fails the first two prongs of the analysis.

a. **The noncompetition covenant is far broader than necessary to protect Medline's legitimate interests.**

In evaluating whether a restriction is necessary to protect an employer's legitimate interests, courts interpreting New Hampshire law will examine the relationship of the employee to the employer's customers as well as the temporal and geographic scope of the covenant. An employee's "special influence over an employer's customers," including customer goodwill, "is one of the legitimate interests an employer may protect against competition." *Merrimack*, 152 N.H. at 198. However, an employer may only bar a former employee from working with a customer when the former employee either had contact with or "gained significant knowledge or understanding of those customers during the course of his or her employment." *Syncom Indus., Inc. v. Wood*, 155 N.H. 73, 80 (2007).

Further, "[a] restraint on competition must be narrowly tailored in both geography and duration to protect [an employer's] legitimate interest in its goodwill. *Concord Orthopaedics Pro. Ass'n v. Forbes*, 142 N.H. 440, 444 (1997). Indeed, "[t]he geographic limits imposed on an employee by a covenant not to compete "generally must be limited to that area in which the employee had client contact, as that is usually the extent of the area in which the employer's goodwill is subject to appropriation by the employee." *Id*. Such "[a] covenant not to compete should last no longer than necessary for the employees' replacements to have a reasonable opportunity to demonstrate their effectiveness to customers." *Id*. When a restriction bears no relationship with a specific customer contact or customer knowledge, "the restrictive covenant goes far beyond the defendant's sphere of customer goodwill, and [is] more restrictive than necessary to protect the plaintiffs' legitimate interests." *Merrimack*, 152 N.H. at 199; *accord Tech. Aid Corp. v. Allen*, 134 N.H. 1, 11 (1991) (holding that an 18-month covenant without any geographic or customer-base limitation was unenforceable because "[a]s to the majority of

25

[plaintiff's] customers, [defendant] has no advantage over any other complete stranger; he has no special hold on their goodwill").

Medline does not and cannot establish that Ausiello has any special interest over or knowledge of Medline's customers throughout the United States. Medline's attempt to do so in the Complaint are limited to the general statement that Ausiello "worked with IDNs on a nationwide basis" (Compl. ¶ 24) and its discussion of *two* specific entities, Aspirus and Massachusetts General health system, (*id.* at ¶ 52, 54), both of which Ausiello has already agreed not to work with at Performance Health. (Ausiello Decl. ¶ 33.) Medline's cursory treatment of the core question of a reasonable geographic scope sufficient to protect its customer goodwill is fatal to its request for a nationwide injunction. And Medline's relative silence on this question is telling, because Ausiello was not a client-facing employee at Medline, instead interacting with clients only upon specific invitation from sales specialists on an ad-hoc basis. (*Id.* at ¶ 18-21.) Moreover, as Market Sales Director, Ausiello worked directly with only six or seven of Medline's clients (including Aspirus and Massachusetts General health system). (*Id.* at ¶ 19.) And in the roughly six-month period when he was Market Sales Director, those six or seven clients were the only customers which Ausiello had significant exposure to in the therapy and rehabilitation category by evaluating customer needs, providing samples, and cross-referencing pricing. (Ausiello Decl. ¶ 20.)

The sole case Medline cites in support of its argument for a nationwide injunction against competition, *ACAS Acquisitions (Precitech) Inc. v. Hobert*, 155 N.H. 381, 384 (2007), is inapposite. (Memo. at 23-24.) In *ACAS*, the Supreme Court of New Hampshire affirmed the trial court's trial ruling that the defendant had violated his two-year noncompetition agreement and was reasonably enjoined from competing with the plaintiff in any field where the plaintiff had generated at least five percent of its gross revenues. *Id.* at 392-93. But in *ACAS*, the record demonstrated that the

26

defendant, who was plaintiff's former Vice President of Sales, had been intimately involved in crafting the plaintiff's marketing strategy through the creation of a marketing memorandum that identified the plaintiff's "key customers, marketing strategies and future business plans, as well as important product and financial information" (the "Memo"). Moreover, the defendant was found to have "had nearly unfettered access to all of [the plaintiff's] trade secrets and confidential company information, and substantial contacts with and influence over customers and potential customers" during his employment with the plaintiff. *Id.* at 392. Further, after the defendant moved to his new employer, he was responsible for creating a new product line that directly competed with the plaintiff and soliciting new customers, and "[n]early all of the companies contacted had been identified in the Memo as customers or potential customers of [plaintiff]." *Id.* at 387. Finally, the court noted that enforcing the covenant would not impose an undue hardship because "the defendant negotiated a substantial severance package in exchange for decreasing the sting of the restrictive covenant and with the full understanding that he might need to relocate." *Id.* at 394.

The exceptional facts present in *ACAS* are simply not present here. Unlike the defendant in *ACAS*, who was an executive with "nearly unfettered access" to the plaintiff's trade secrets and customer lists as well as substantial contact with the plaintiff's customers, Ausiello had limited exposure to customers over his brief, six-month employment as Market Sales Director and only extensively researched the needs of six or seven Medline customers. (Ausiello Decl. ¶ 19-20.) Further, unlike the *ACAS* defendant, who left his employer with the intent to develop a directly competing product, contacting his former employer's customers along the way, Ausiello will not be directly competing with Medline because, while Medline prices its contracts on a case-by-base basis, Performance Health's prices are initially fixed a contract level and subject to approval by a pricing team, not Ausiello. (*Id.* at ¶ 36-37.). And there is no evidence that Ausiello has contacted

any of Medline's customers of which he is aware or performed work for while Market Sales Director—and Ausiello intends not to do so. (*Id.* at ¶ 40.) For these reasons, Ausiello lacks the kind of unique role and know-how that led the *ACAS* court to affirm the trial court's ruling that a nationwide noncompete was enforceable.

Instead, this case is more akin to *Merrimack*. In *Merrimack*, a defendant sales representative had executed a noncompetition covenant that prohibited him from "doing business with any of the clients who had transacted business with [the plaintiff] in the previous year." *Merrimack*, 152 N.H. at 199. Of note, the defendant had previously received a pricing book, "a confidential document that outlines the pricing structure used by the plaintiffs," that he returned upon his resignation. *Id.* at 194. After the defendant joined a competitor, the plaintiff sued to enforce its general noncompetition agreement. On appeal from denial of the defendant's motion for a preliminary injunction, the Supreme Court of New Hampshire affirmed the trial court's conclusion that the covenant was overly broad and unenforceable. *Id.* at 200. The Supreme Court of New Hampshire concluded that the noncompetition covenant was greater than necessary to protect the plaintiff, particularly given that out of the plaintiff's roughly 1,200 customers, the defendant had regular contact with about sixty. *Id.* at 199. The same logic applies here: Medline seeks a nationwide injunction preventing Ausiello from working for Performance Health without any limitation, but there is no basis for such a request when Ausiello had limited direct interaction with and knowledge of Medline's customers outside of six or seven exceptions. For these reasons, the noncompetition covenant is overly broad and unenforceable.

### b. The noncompetition covenant imposes an undue burden on Ausiello.

Since imposing a nationwide noncompetition obligation on Ausiello does not protect Medline's legitimate interests, this Court need go no further. *See Merrimack*, 152 N.H. at 199-200.

However, such a covenant would represent an undue burden on Ausiello by effectively preventing him from working for 18 months. "Where the restriction is greater than necessary to protect the legitimate interests of the employer, any adverse effect caused by that part of the restriction which is unnecessary constitutes an undue hardship on the employee." *Tech. Aid*, 134 N.H. at 10. As discussed *supra* at Section I(C)(2)(a), enjoining Ausiello from competing with Medline over customers with which he had no contact or significant knowledge represents an unnecessary and thus undue restriction. Further, unlike the defendant in *ACAS*, who was an executive and had negotiated a substantial severance in exchange for his noncompetition agreement, Ausiello was not provided with any additional monetary consideration for his covenant. 155 N.H. at 394. For these reasons, too, Medline is unlikely to succeed on the merits of this claim.

### 3. Ausiello is not violating his obligations under the Agreement

"Under New Hampshire law, a breach of contract occurs when there is a failure without legal excuse to perform any promise which forms the whole or part of a contract." *Keene Auto Body, Inc. v. State Farm Mut. Auto. Ins. Co*., 175 N.H. 503, 511 (2022). "[W]here a breach causes no damages or prejudice to the other party, it may be deemed not to be 'material." *Found. for Seacoast Health v. Hosp. Corp. of Am.*, 165 N.H. 168, 182 (2013). Medline's breach of contract claim is predicated on Ausiello's supposed violation of three restrictive covenants: Section 11 (return of property), Section 5 (use of confidential information), and Section 7 (noncompetition).

As to Medline's claim that Ausiello failed to return certain company property in violation of Section 11 of the Agreement, that claim fails because Ausiello has destroyed all company information in his possession. Thus, Medline has no damages resulting from any nominal breach. Medline's claim that Ausiello retained company confidential information in violation of Section 5 of the Agreement fails for the same reason—Ausiello has destroyed any such information in his possession and therefore Medline cannot establish any harm resulting from Ausiello's actions.

36305422.2

While Medline argues that Ausiello will "inevitably" use Medline's confidential information (Memo. at 7, 18, 22), New Hampshire does not appear to recognize the "inevitable misappropriation" doctrine, and Medline cites no case law in support of the application of that doctrine here. And even if the inevitable disclosure doctrine were available under New Hampshire law, this Court should not apply it in these circumstances. Contrary to occasions in which courts in this circuit have applied the doctrine, *see PepsiCo, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir. 1995), Ausiello is not a high-level employee with access to significant information that will enable Performance Health to "know[] exactly how [Medline] will price, distribute, and market its [services] and be[] able to respond strategically." *Id.* at 1270. Instead, Ausiello is in a new role with Performance Health in which he is responsible for clients that are frequently subject to multi-year pricing contracts. (Ausiello Decl. ¶ 37.) Indeed, Ausiello's new role is not centered on quoting prices at all. (*Id.*) Even where the doctrine is available, courts are rightfully skeptical of its invocation, as "a broad application would be an effective bar against employees taking similar positions with competitive entities." *Admiin Inc. v. Kohan*, 2023 WL 4625897, at *10 (N.D. Ill. July 19, 2023) (providing that "[t]o evaluate an inevitable disclosure theory, courts consider three factors: "(1) the level of competition between the former and new employer; (2) the similarity between the employee's former and new positions; and (3) the actions the new employer has taken to prevent the use or disclosure of the former employer's trade secrets"). Given New Hampshire's apparent lack of any equivalent doctrine and Ausiello's distinct responsibilities with Performance Health, this Court should find that there are likely no damages resulting from Ausiello's conduct here.

Finally, as to the noncompetition covenant, Ausiello is not alleged to have competed with Medline for any clients that are located within 50 miles of Ausiello's home. In particular, he has

agreed not to perform any work for Aspirus and Massachusetts General health system. Therefore, Medline cannot establish the breach element of its contract claim with respect to Section 7 of the Agreement.

## II. MEDLINE CANNOT ESTABLISH ANY LIKELIHOOD OF IRREPARABLE HARM, AND MEDLINE HAS AN ADEQUATE REMEDY AT LAW IN THE FORM OF MONEY DAMAGES

As a threshold matter, Medline argues for a presumption of irreparable harm. (Memo. at 11-12.) That argument, however, is based on outdated law. *See Life Spine, Inc. v. Aegis Spine, Inc.,* 8 F.4th 531, 545 (7th Cir. 2021) ("presumption of irreparable harm … upon showing of likely success on a trade secret claim … used to be true in this circuit … [b]ut the Supreme Court rejected such a presumption in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006), as we explained in *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 755 (7th Cir. 2012)").

With no presumption available, even if Medline succeeds on the merits in this case it has an adequate remedy at law in the form of money damages. This precludes a finding of irreparable harm. Lost sales like Medline's Aspirus opportunity generally do not constitute irreparable harm because money damages could compensate Medline for any lost sales attributable to Ausiello. "[H]arm stemming from lost customers or contracts may be quantifiable if the lost customers or contracts are identifiable." *DM Trans, LLC v. Scott*, 38 F.4th 608, 618 (7th Cir. 2022) (affirming denial of preliminary injunction based on lost profits and lost sales opportunities). That is because it would be a "straightforward process to calculate whether sales volumes" went to Performance Health instead of Medline. *Id*. This type of harm "would ultimately translate into lost profits." *Id*. at 619. The lost customers and contracts here would be identifiable. Indeed, Medline has already specifically identified one such opportunity—Aspirus.

That is not the only reason the Court should find no irreparable harm. Medline's conduct

fundamentally contradicts its claim of irreparable harm requiring emergency judicial intervention because it waited nearly a month from the alleged harm to filing suit, demonstrating that no genuine emergency exists.

The chronology of events exposes Medline's delay. Ausiello resigned on May 5, 2025, informing Medline he was joining Performance Health, allegedly Medline's "principal competitor." (Compl. ¶¶ 40, 41, 64.) Medline immediately recognized the alleged threat, sending demand letters on May 7-8, 2025. (*Id*. at ¶ 66.) On May 12, 2025, the only concrete evidence of alleged harm materialized when Aspirus "cut off discussions" with Medline, citing better pricing from Performance Health. (*Id*. at ¶ 64.) Ausiello commenced employment with Performance Health on May 20, 2025. (*Id*. ¶ 40.) Yet Medline waited until June 2, 2025 – nearly a month later after its initial notice of Ausiello's employment with Performance Health – to file this lawsuit, and another day to file its motion for emergency relief, notably without seeking an expedited hearing. This 28-day delay after learning of Ausiello's departure and 21-day delay after the only concrete manifestation of alleged competitive harm is fatal to Medline's irreparable harm claim.

Medline's delay is particularly damaging because the company possessed complete knowledge of all material facts from the outset. By May 12, 2025, Medline knew Ausiello had joined its "principal competitor," that Performance Health was allegedly using Medline's information to offer "better pricing," and that Medline had lost the Aspirus opportunity – the only specific business loss it alleges in its Complaint. (Compl. ¶¶ 41, 64.) Despite having full knowledge of these facts, Medline chose to wait nearly three additional weeks before seeking judicial intervention.

The Seventh Circuit and courts in this district have consistently held that delay undermines claims of irreparable harm because the likelihood of irreparable harm takes into account how

32

urgent the need for equitable relief really is. *Ideal Indus., Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1025 (7th Cir. 1979). This principle applies with particular force where the plaintiff has "knowledge of the pending nature of the alleged irreparable harm." *Ixmation, Inc. v. Switch Bulb Co., Inc.*, 2014 WL 5420273, at *7 (N.D. Ill. Oct. 23, 2014). Courts routinely deny emergency relief based on similar delays. *See Traffic Tech, Inc. v. Kreiter*, 2015 WL 14068877, at *3 (N.D. Ill. Sept. 1, 2015); *Johnson Pub. Co. v. Willitts Designs Int'l, Inc.*, 1998 WL 341618, at *8 (N.D. Ill. June 22, 1998).

Medline's inexcusable delay demonstrates that no irreparable injury exists. A company facing true irreparable harm does not wait a month to seek relief while its alleged trade secrets are being exploited by its "principal competitor." Medline's motion should be denied on this basis alone.

### III.     THE BALANCE OF HARMS FAVORS AUSIELLO

Since Medline cannot show a likelihood of success on the merits, the Court's analysis could end here. *Vill. of Orland Park v. Pritzker*, 475 F. Supp. 3d 866, 889 (N.D. Ill. 2020). But even if Medline can show some likelihood of success on the merits, the balance of harms favors Ausiello rather than Medline. "Under the 'sliding scale approach,' the less likely a plaintiff is to prevail, the more the balance of harms must weigh in his or her favor for preliminary injunctive relief to be warranted." *Id.* Given Medline is unlikely to succeed on its claims, this Court should heavily weigh the impact on Ausiello of preliminarily enjoining him from working nationally in the sale of rehabilitation products. Such an injunction would effectively prevent Ausiello from gainful employment, as his work experience is almost exclusively in this field. In contrast, Medline would suffer no prejudice from Ausiello working for Performance Health in a different capacity than his role with Medline. And, even if Medline were to suffer harm (it will not) Medline would have an adequate remedy at law through money damages. The balance of harms thus favors Ausiello.

36305422.2

IV.     **THE PUBLIC INTEREST DOES NOT FAVOR AN ORDER ENJOINING AUSIELLO FROM WORKING**

The public interest, too, favors rejecting a temporary restraining order. "The public policy of New Hampshire encourages free trade and discourages covenants not to compete." *Concord*, 142 N.H. at 442. Lawful competition is in the public interest, *see Vienna Beef, Ltd. v. Red Hot Chicago, Inc.*, 833 F. Supp. 2d 870, 877 (N.D. Ill. 2011), and Ausiello's (and his current employer's) employment relationship should be respected.

V.      **THE COURT SHOULD REQUIRE MEDLINE TO POST A SIGNIFICANT BOND IF IT ENTERS A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION**

Medline failed to make a "clear showing" of entitlement to drastic injunctive relief, but if the Court is inclined to grant such relief Ausiello does not waive his right to demand that Medline post bond. "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). In the Seventh Circuit, "courts are required, with few exceptions, to order those who seek injunctive relief to post bonds." *Geneva Assur. Syndicate, Inc. v. Med. Emergency Servs. Assocs. (MESA) S.C.*, 1992 WL 92034, at *12 (N.D. Ill. Apr. 29, 1992). "A bond is a condition to preliminary injunctive relief." *Mead Johnson & Co. v. Abbott Labs.*, 209 F.3d 1032, 1033 (7th Cir. 2000). The amount of the bond is left to the discretion of the court. *See Smith v. Office of Civilian Health & Med. Program of Uniformed Servs.*, 97 F.3d 950, 954 n.5 (7th Cir. 1996).

### CONCLUSION

For the foregoing reasons, Ausiello respectfully requests that this Court deny Medline's Motion and grant him such other and further relief that this Court deems appropriate.

Dated: June 9, 2025                     s/ Micah E. Marcus
                                        Micah E. Marcus

34

36305422.2