# **Exhibit A**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MEDLINE INDUSTRIES, LP, | ) |
|     Plaintiff, | ) Case No. 25-cv-06153 |
| v. | ) Hon. John F. Kness |
| AL AUSIELLO, | ) |
|     Defendant. | ) |

**DECLARATION OF AL AUSIELLO IN SUPPORT OF DEFENDANT'S RESPONSE IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER**

I, Al Ausiello, under penalty of perjury and in accordance with the requirements of 28 U.S.C. § 1746, hereby declare and state as follows:

1. I am over the age of 18, have personal knowledge of the facts set forth herein, and could testify competently to them if called upon to do so.

2. I make this declaration in opposition to the motion and memorandum of Medline Industries, LP ("Medline") for a temporary restraining order and preliminary injunction.

3. I currently reside in Nashua, New Hampshire.

4. From approximately 2004 to 2019, I was employed by Performance Health, progressing from sales representative to Area Sales Manager/Branch Manager.

5. In August 2019, I left my employment at Performance Health to work for Medline Industries, LP ("Medline"). I remained at Medline through May 2025, when I returned to work for Performance Health.

6. I am currently employed by Performance Health. My first day back with Performance Health was May 20, 2025.

1

36307500.1

**Roles and Responsibilities at Medline**

7. Medline is a provider of medical-surgical products and supply chain solutions among a wide range of medical industries.

8. In August 2019, I was hired by Medline as a Sales Specialist in the Equipment & Furnishings Division.

9. On August 1, 2022, I was promoted to Senior Sales Specialist.

10. On January 1, 2024, I moved into the position of Product Sales Specialist Advanced.

11. And on January 1, 2025, I was promoted to Market Sales Director. In connection with that promotion, I executed a Confidentiality, Protective Covenants & Arbitration Agreement (the "Protective Agreement") dated January 30, 2025. A copy of the Protective Agreement is attached to the Complaint as Exhibit A.

12. Throughout my tenure at Medline, I have worked in the acute care, post-acute care, and physician office divisions and managed three product categories: (i) therapy/rehabilitation; (ii) safe patient handling; and (iii) fall prevention. The majority of Medline's dollar volume fell within the safe-mobility space.

13. In my Sales Specialist positions, I supported Medline's acute sales team, post-acute, and physician office sales teams Integrated Delivery Network ("IDN") managers, and national account personnel on group purchasing organization ("GPO") projects. I gathered data and maintained information on customers, analyzed product needs, and conducted market research on product offerings, amongst other things.

14. Importantly, my role had a limited client facing component. I was not tied to specific customer accounts and did not own customer relationships.

15. Rather, I appeared before customers *only* when invited by the account-holding salesperson to assist with the preparation and presentation of products or information in connection

with opportunities that the salesperson identified.

16. Although my title changed between August 2019 and May 2025 and I moved from all market classes to just acute in 2023, my roles and responsibilities generally remained the same.

17. When I became Market Sales Director, I do not recall receiving a written identification or assignment of accounts or geography.

18. As Market Sales Director, I continued to support Medline's acute sales team, IDN managers, and national account personnel on GPO projects larger than my prior roles. I oversaw and managed the sales activities of the market, collected data, implemented strategies and policies to meet corporate marketing objectives, among other things. The role only had a limited client-facing component.

19. As Market Sales Director, I worked directly (face-to-face) with only six or seven of Medline's customers in the therapy and rehabilitation category, including Aspirus and Massachusetts General.

20. As a Market Sales Director, those six to seven customers were the only customers which I had significant exposure to in the therapy and rehabilitation category by evaluating customer needs, providing samples, and cross-referencing pricing.

21. Because I was not client-facing nor a Medline salesperson, I was not the primary contact between Medline and any client, including Aspirus.

22. Rather, Paul Pagel was the point of contact with Aspirus. All of my communication with Aspirus was at the direction of Pagel. I was not involved in determining final pricing for Aspirus.

23. I have no knowledge regarding Aspirus's decision to remain with Performance Health—it predated my employment with Performance Health. I had no involvement whatsoever

in Performance Health's retention of Aspirus's business.

24. I did not have any direct reports while Market Sales Director at Medline, and I was not the manager or supervisor for any employees.

25. My last day with Medline was on May 7, 2025.

26. Thereafter, I permanently deleted all Medline emails and files from my personal laptop, email account, and devices.

27. On May 19, 2025, at the request of Medline's counsel, I executed a written certification, consistent with Section 11 of Medline's Protective Covenants Agreement, regarding the return of all Medline property and deletion or destruction of all Medline information in my possession. A true and correct copy of the Certification is attached hereto as **Exhibit 1**. During the week of May 27, 2025, I performed a search of my personal computer and devices to make sure that all Medline information and data had been destroyed and/or deleted.

28. The Certification confirms that I searched all hard copy files and my devices and destroyed all property belonging to Medline, that I no longer have any property belonging to Medline or any Confidential Information, and I have not provided any Confidential Information to Performance Health or any other third party. *See* Ex. 1.

29. To the best of my knowledge, all Medline information and data that was in my possession at the conclusion of my employment with Medline has been destroyed and/or deleted.

**Employment with Performance Health**

30. On May 19, 2025, I began my new employment as a National Accounts Executive with Performance Health. On May 22, 2025 I executed an Asset Protection Agreement with Performance Health. A true and correct copy of the Agreement is attached hereto as **Exhibit 2**. I agreed not to use or disclose any trade secrets or other confidential information of Medline in the course of my employment with Performance Health. *See* Ex. 2 at § 3.

31. In my role as National Accounts Executive, I work directly with GPOs and IDNs that purchase through those GPOs.

32. Performance Health's primary business is in the therapy/rehab category. Performance Health has limited sales of safe-patient-handling or safe-mobility products—product lines I managed at Medline.

33. My superiors at Performance Health have repeatedly confirmed that I will not be placed on the Aspirus or Massachusetts General accounts.

**Lack of Overlap between Medline and Performance Health**

34. The overlap between my roles at Medline and Performance Health is insignificant.

35. Medline operates on a project-based, price-negotiated model in the acute care space. In Rehab/Fall Prevention Division that I worked in, Medline derives substantial revenue from fall prevention and safe patient-handling equipment—areas in which Performance Health has minimal participation.

36. Medline is not on national GPO contracts for its products in the Therapy and Rehab Category. Instead, Medline prices items where we felt it would be competitive, and the acute sales team and Medline's pricing team and analyst would determine if it was acceptable. The acute sales force determines pricing on a case-by-case basis.

37. Performance Health, on the other hand, already holds multi-year contracts with the major GPOs. Pricing is initially fixed at the contract level. It is ordinarily negotiated by Performance Health's dedicated pricing team, not by its salespeople. My understanding is that salespeople in Performance Health's national accounts division (where I now work) are able to propose local agreements with customers, but the pricing team must approve any pricing that is lower than the contract prices. My responsibilities center on contract administration and relationship management, not on setting or adjusting prices.

5

38. Moreover, at Medline I was "one step removed" from GPOs and IDNs—I was never client-facing unless specifically brought in by the account director for a limited purpose, such as presentations.

39. Conversely, at Performance Health, I will be interfacing directly with customers regarding a different business model and product scope. I will not be assigned to the accounts that Medline raises in their Motion (Aspirus and Massachusetts General).

40. To my knowledge, I have not (and will not) be assigned to accounts of customers I worked with at Medline in the therapy/rehab category as Market Sales Director.

**Receipt and Handling of Medline Information**

41. As mentioned above, one of my duties at Medline was to maintain data for the sales personnel. To that end, I routinely created spreadsheets and other materials for use by Medline's acute sales colleagues.

42. On several occasions in April and early May 2025, I forwarded such working documents to my personal email.

43. Every document that I sent to my personal email account has been deleted and destroyed.

44. Because I do not possess any Medline emails or information, I am unable to confirm or deny the allegations in the Memorandum in Support of the Motion for Temporary Restraining Order ("Motion") regarding other specific emails and documents purportedly sent to my personal email on April 22, 25, and 28, 2025. (Mem. at 8).

45. Nonetheless, to the extent I sent any Medline information to my personal email, it was never shared with Performance Health or any other third party and has since been deleted or destroyed at the request of Medline's counsel.

46. I never provided the information in any document to Performance Health or any

other third party.

47. In connection with my work for Medline, I was authorized to access Medline's computer networks and systems, including Medline's Data Analytics Research Tool (referred to as "DART"). I was given the ability by Medline to access all information set forth in any Medline documents sent to my personal email account.

48. To the best of my knowledge at present I do not possess, on any device or cloud account, any Medline property or Confidential Information.

49. I do not remember the data specifically reflected in the Medline documents, including specific client pricing, sent to my personal email.

50. The laptop Performance Health issued to me on or about June 1, 2025 has never contained Medline data.

**No Harm to Medline**

51. Since resigning from Medline, I have not solicited any Medline customer, prospect, or employee. I have not used, and will not use, any Medline confidential information in my work for Performance Health.

52. Although I forwarded certain Medline files to myself, I have deleted all such files, retain none, and have never disclosed them to Performance Health.

53. My present employment at Performance Health is materially different from my former role at Medline. Therefore, there is no risk to Medline.

54. Conversely, if the Court were to restrain me from performing my national-account duties at Performance Health, I would lose my livelihood. I am currently going through a divorce, live alone, and am solely responsible for my living expenses. The harm—losing my livelihood and ability to pay my living expenses—far outweighs any speculative risk Medline asserts.

55. Accordingly, the relief Medline seeks is unnecessary and inequitable.

Docusign Envelope ID: D16B2057-B9B4-4ACD-80EB-F0BAE498684C

Under 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

FURTHER DECLARANT SAYETH NOT.

6/9/2025

Signed by:
*Al Ausiello*
2C62DBC204CE4A1...

Al Ausiello

8

36307500.1